[No. 76.  Decided August 8, 1890.]

JAMES B. METCALFE V. THE CITY OF SEATTLE, AND
    ROBERT MORAN, D. A. McKENZIE, THOMAS E.
    JONES AND D. E. DURIE.

CONSTITUTIONAL LAW — MUNICIPAL INDEBTEDNESS — CONSTRUC-
TION.

Article 8, § 6, of the constitution of the State of Washington,
provides that no city shall for any purpose, become indebted in
any manner exceeding 1½ per cent. of the taxable property in such
city, without the assent of three-fifths of the voters therein, voting
at an election to be held for that purpose, nor shall the total indebt-
edness thus assented to at any time exceed 5 per cent. on the value
of the taxable property therein; but "any city or town, with such
assent, may be allowed to become indebted to a larger amount, not
exceeding 5 per cent. additional, for supplying such city or town
with water, artificial light, and sewers, when the works for supply-
ing such water, light, and sewers, shall be owned and controlled by
the municipality." *Held*, That a municipal corporation may be-
come indebted, for the purpose of providing a water and sewerage
system, in any sum, provided the total municipal indebtedness does
not exceed ten per cent. of its last assessment roll.

The majority of three-fifths of the voters necessary to carry an
election for the increase of municipal indebtedness above 1½ per
cent. of the assessment roll, is three-fifths of those persons who
actually vote at the election, and not three-fifths of all those who
may have the right to vote thereat.

*Appeal from Superior Court, King County.*

Injunction against defendants, as mayor and finance com-
mittee of the common council of the city of Seattle, to re-
strain them from selling or otherwise disposing of bonds
theretofore issued, in the sum of $955,000, under ordinance
No. 1343, of said city, for the purchase of water-works,
and the construction of a sewerage system.  In pursuance
of notice, a special election was held in the city of Seattle,
on the 4th day of June, 1890, for the purpose of voting
upon the proposed issuance of bonds for that purpose.
The whole number of voters who voted at the election was
721, and the number who voted in favor of issuing the

bonds was 705, said number not being three-fifths of the qualified voters in said city, nor three-fifths of the persons entitled to vote at said election. The total value of the taxable property of the city of Seattle, according to the last assessment for city purposes, was $16,016,900.00. The existing indebtedness of the city amounted to about the sum of $400,000. The additional indebtedness proposed to be incurred was more than five per cent. of the total valuation of taxable property. Judgment for defendants, and plaintiff appeals.

*J. C. Haines* and *Charles F. Fishback*, for appellant.

*S. H. Piles,* (*Thomas R. Shepard,* of counsel), for appellees.

The opinion of the court was delivered by

STILES, J. — This was an amicable suit brought to obtain the court's construction of § 6, article 8 of the constitution, and the legislation had thereunder, resulting in the act of February 26, 1890 (Session Laws, p. 225), and the act of March 26, 1890 (Session Laws, p. 520), as applied to the city of Seattle, which was proposing to issue certain bonds for a water and sewerage system, amounting to $955,000. The controversy, however, was a real one, and under the pleadings fairly brought to this court two questions for answer, viz.: 1. Can a municipal corporation become indebted for water-works, sewers and artificial light works in any sum greater than *five* per cent. of its last assessment roll? 2. To carry an election, where the question is that of increasing municipal indebtedness above one and one-half per cent. of the assessment roll, must the majority of three-fifths required be three-fifths of all the persons entitled to vote at the election, or three-fifths of those who do vote thereat?

The circumstances which caused the presentation of the first question seem to have been a dispute as to whether,

under the terms of the constitution and the acts referred to, the matter of providing water, sewers and light for the inhabitants of a city is a "municipal purpose," or a "strictly municipal purpose." It is a fundamental principle in the law of municipal incorporations that, although they are usually given a large discretion in the matter of raising and expending money, no money can be raised or expended for any but a "strictly municipal purpose," and that limitation is just as much laid upon the cities of this state with regard to the first one and one-half per cent. of indebtedness as it is upon the additional three and one-half per cent. which must be authorized by a vote, although, in the latter case, the framers of the constitution saw fit to express the limitation. But in our view, there is nothing in the constitution which forbids the idea that works of the character of those under discussion are those of a strictly municipal character, and therefore, proper works for a municipality to undertake and maintain, either out of the current revenue, or the first five per cent. of indebtedness. The limittation declared by the constitution is, that whenever the indebtedness has reached five per cent. it must stop, unless more money is needed for water or light works, or sewers. And, in this connection, we may say, in response to argument at the hearing, that we regard the language of the constitutional provision as reading in the disjunctive, as though it were "water, artificial light *or* sewers." The city of Seattle was authorized by its charter (Act of 1886, pp. 240, 241, 244) to build, own, and operate such works, and to levy taxes therefor. It lacked only the power to incur indebtedness. This power it did not receive from the chapter of the constitution on municipal indebtedness, it is true; for that chapter contains no grant of power to these incorporations. It leaves them entirely to the legislature; but, deeming it certain that future legislatures would permit such indebtedness, it prescribed the limitations under which the power, when granted, must be exer-

cised, and beyond which it must not go. The power was conferred upon the city of Seattle by the acts of the legislature referred to, we conceive, in very clear terms, though the appellant suggested a doubt on that point even.

These two acts are entitled to be construed together, they having been passed at the same session; and we see no necessity to hold that the act of March 26th repealed that of February 26th. On the contrary, the latter act seems to form a fitting complement to §§ 2 and 3 of its predecessor, elaborating the machinery by which they are to be operated, and leaving no room for hasty, careless or underhand proceedings. By the last act the legislative body of the city must first express, by ordinance, the intention of the city to avail itself of its power to inaugurate and maintain such works, specifying a distinct plan or system to be followed, with the estimated cost thereof, and the question of the adoption of the plan proposed must be submitted to the voters of the city. Clearly the intention was, that whereas such works are likely to demand large and unusual expenditures, the wisdom of which, in some cases, may be doubtful, the people who would have to furnish the means should be fully apprised of the whole scheme, and that there should be a definite, well-considered, and practicable scheme presented for their rejection or adoption. If no authority to incur indebtedness beyond the current revenue is asked for, the proposition may be carried by a majority vote. But, if it is intended that the city shall incur a debt for these costly works, the majority to carry the proposition must be three-fifths, and the indebtedness must be created by the *issuance of bonds* to run not exceeding twenty years, at a rate of interest not exceeding six per cent. The three-fifths majority having been obtained, there is no further obstacle to the issuance of such bonds, although they amount to more than five per cent. of the taxable property of the city, providing that with their issuance the

total indebtedness of the city is not increased to more than ten per cent. of such property.

In response to the second question, we have not the least hesitation in answering that the three-fifths majority required to carry an election in favor of increasing municipal indebtedness, is three-fifths of those persons who actually vote at the election, and not three-fifths of all those who may have the right to vote thereat. The language of the constitution is, that no municipal corporation shall become indebted beyond one and one-half per cent. of its taxable property " without the assent of three-fifths of the voters therein voting at an election to be held for that purpose." How could words be plainer? It is three-fifths of the *voters voting*, not of all persons who might vote, but may or may not do so. The word "therein" placed between "voters" and "voting" merely qualifies the persons who might vote, not the body of voters who must vote to constitute a lawful majority. At certain elections many persons residing outside of a city have their voting places assigned within the city limits; but, at these particular elections, it is only the voters "therein" — residing therein — who can vote. Perhaps, a longer phrase might have served to remove all doubt from every mind, but, to us, the interpretation seems clear as it is.

In every other instance, we believe, where the constitution prescribes the majority required to carry a particular proposition submitted to the electors, it is a majority of those who vote upon that proposition. See art. 8, § 3, authorizing the state to contract debts; art. 11, § 2, of the removal of county seats; art. 11, § 10, of the adoption of charters by cities; art. 15, §§ 1, 2, of the location of the seat of government; art. 23, § 1, of amendments to the constitution, and § 2, of the calling of constitutional conventions. Against this it may be said that, in each of the instances mentioned, the majority required is only a majority of those voting on the question submitted; but when

we observe that in all these cases the questions are to be submitted at general elections, where the whole number of votes cast may far exceed those cast for and against the particular proposition, the general policy of the constitution becomes clear in no case to require an absolute majority of all those who vote at a general election to carry a special proposition, but only a majority of those who see fit to express themselves upon the proposition; and this policy being so, why, in this case of municipal indebtedness, should we, without any special or apparent reason, argue plain words out of their ordinary meaning, and conclude that a departure was intended from the otherwise steady policy of the constitution simply because precisely the same form of words is not used? These elections are hedged about with all the precautions to secure fairness and a full vote that general elections have. Being purely special elections, they are free from the political influences and the vice of trading which often unjustly sway and control the vote on such matters at general elections. Every elector has full constructive notice, and it would be strange, indeed, if he did not have actual notice, of the pending question, and cannot complain if the result, without his vote, is not according to his desire.

This question of majorities has been discussed by several of our courts of last resort, in cases similar to this. In North Carolina (*Southerland v. Goldsboro*, 96 N. C. 49, and *Duke v. Brown*, 96 N. C. 127), in Georgia (*Bell v. Americus*, 79 Ga. 152), and in Mississippi (*Hawkins v. Carroll County*, 50 Miss. 735), the supreme courts of those states held that no less than a majority of all the persons qualified to vote was sufficient to carry the several propositions submitted. But in *Carroll County v. Smith*, 111 U. S. 556, the supreme court of the United States reviewed the case of *Hawkins v. Carroll County*, and dissented from and overruled it. The consti-

tution of Mississippi contained a provision that the legislature should authorize no county to aid any railroad company "unless two-thirds of the qualified voters of such county . . at a special election or regular election to be held therein, shall assent thereto;" and this language the court, in *Carroll County v. Smith*, held to mean two-thirds of the qualified voters present and voting at the election in favor of the proposition as determined by the official return of the result, saying: "In that connection a voter is one who votes; not one who, although qualified to vote, does not vote." This decision of the supreme court but followed its earlier decisions in similar cases, viz.: *St. Joseph Township v. Rogers*, 16 Wall. 644, and *County of Cass v. Johnston*, 95 U. S. 360. In the last-named case the constitution of Missouri prohibited townships from aiding railroad companies "unless two-thirds of the qualified voters of the . . town, at a regular or special election to be held therein, shall assent thereto," which is identically the same language, slightly transposed, as that of the Mississippi constitution, above quoted. But what was known as the "Township Aid Act" of Missouri, approved March 23, 1868, authorized townships to subscribe to the capital stock of railroad companies "whenever two-thirds of the qualified voters of the township, *voting* at an election called for that purpose, shall vote in favor of the subscription;" and it will be noted that the language of this "Township Aid Act," "voters of the township voting," is precisely the same as that of our constitution, "voters therein voting." In that case the parties and the court agreed in construing the meaning of the legislative provision to be what we hold it to be here, that the majority meant was a majority of those who voted; but the defendant in error contended that the constitutional provision required a majority of all the qualified voters of the township, but not successfully, for the court construed the constitution and the act to mean the same thing, and said that any other construc-

tion would be productive of the greatest inconvenience, and ought not to be adopted, unless the legislative will to that effect were clearly expressed. In McCrary on Elections, (3d ed.), § 173, the general rule is laid down thus: "Where a statute requires a question to be decided . . by the votes of the 'majority of the voters of a county,' this does not require that a majority of all persons in the county, entitled to vote, shall actually vote affirmatively, but only that the result shall be decided by a majority of the votes."

The plaintiff, by two insufficient paragraphs of his complaint, attempted to set forth a second cause of action, alleging that the city of Seattle was indebted in about the sum of $400,000, which was $159,746.50 in excess of the indebtedness allowed to be incurred by law, and which excess was contracted since the act of February 26, 1890, validating certain municipal indebtedness, without the assent of three-fifths of the voters of the city. And he further alleged that the city was attempting to fund the said excess without a vote, and that it would do so unless restrained. His application for an injunction upon this statement of facts was refused, and we think rightly. The complaint was too vague, containing, as it did, no statement of any act on the part of the city's representatives threatening the alleged funding. At the hearing in this court, the parties, by agreement, sought to amend the pleading and obtain a construction of the statute above mentioned; but we must decline to permit the amendment, as, in our view, it does not come within the rules which allow amendments in this court. We have looked into the proposed pleading, however, and find it open to the same objection as its original, viz.: That it shows no acts going to constitute an invasion of the limits set up by the funding act, or a threat to invade the same. In short, it discloses no real controversy such as appears in the first cause of action. The things feared may be done, or attempted, and they may never be. When some step in their direction is taken, it will be time

enough to appeal to the courts. Upon all grounds, there-
fore, the action of the court below in sustaining the de-
murrer to the complaint should be sustained, and its
judgment affirmed; and it is so ordered.   Costs to the ap-
pellee.

ANDERS, C. J., and HOYT, DUNBAR and SCOTT, JJ.,
concur.