[No. 953. Decided June 2, 1893.]

EDMUND SEYMOUR, *Respondent*, v. THE CITY OF TACOMA, HERBERT S. HUSON, SAMUEL C. SLAUGHTER, GEORGE W. BOGGS, JOHN T. LEE, AND THE TACOMA LIGHT AND WATER COMPANY, *Appellants*.

MUNICIPAL CORPORATIONS — PURCHASE OF WATER WORKS — ISSUANCE OF BONDS — NOTICE OF ELECTION — LIMITATION OF INDEBTEDNESS.

Where there has been a substantial compliance with the requirements of the law governing notice of elections, in the matter of voting municipal bonds, and there has been a fair election thereunder, the result cannot be defeated by technical irregularities, such as posting the notice only twenty-six days instead of thirty, and failure to publish the notice in the official paper on the day imme-

diately preceding the election, when the ordinance required publication for the thirty days next preceding election day.

Under the charter of the city of Tacoma the assessment for purposes of taxation is not complete when the board of equalization has finished its labors in fixing and equalizing values, but the assessments, as equalized, must be added up on the rolls by the comptroller, and the same delivered by him to the city council before the assessment can be used as a basis for computing the limitation on municipal indebtedness. (DUNBAR, C. J., dissents.)

An election for the issuance of bonds for the purchase of water works is not void for the reason that at the same election there was also submitted another proposition for the issuance of bonds for the construction of a bridge.

Where, subsequent to a municipal election for voting bonds for the purchase of water works, but prior to their issuance, a new assessment becomes operative, whereby the valuation of taxable property is reduced, the city may. be enjoined from issuing bonds in excess of five per cent. of the existing valuation, although, under the valuation in force at the time of the election, the city could lawfully vote for a larger issue.

Under the act of 1891, the limitation upon municipal indebtedness for water works, light plants and sewers is five per cent. of the total valuation of property within the city limits. (*Metcalfe v. Seattle*, 1 Wash. 297, distinguished.)

Where municipal bonds are not payable out of the general fund, but out of the proceeds of special taxes, the amount of cash in the general fund cannot be credited upon the amount of bonded indebtedness proposed so as to reduce the municipal indebtedness below the five per cent. limit.

*Appeal from Superior Court, Pierce County.*

*Parsons, Corell & Parsons*, and *F. H. Murray*, for appellants.

*A. E. Buell*, for respondent.

The opinion of the court was delivered by

STILES, J.—The election sought to be enjoined in the former case of *Seymour v. Tacoma, ante*, p. 138, having been held, and it having resulted in a legal majority in favor of the proposition then submitted, the same plaintiff

now seeks to enjoin the issuance of the bonds authorized by this second suit against the city and the officers who constitute the sinking fund commission or finance committee of the city under its charter, they being charged with the duty of negotiating all such issues of bonds. The Tacoma Light and Water Company is also made a defendant, because of a claim alleged to be made upon its part that it has a binding contract for the sale of its plant through its offer to sell, the passage of the ordinance No. 790, and the result of the election.

The last clause of section 9 of the ordinance mentioned directed the city clerk to publish the election notice in the city official newspaper for "thirty days *next preceding* said election," and to post the same "for the like period" at all of the places designated as voting places. The election was noticed for, and was held on Tuesday the 11th day of April, and the complaint shows that, in fact, the notice was published in the official newspaper from March 11 to April 9, inclusive, a full period of thirty days; but it was not published in said paper on April 10, which was Monday, and the last day preceding the election. The complaint does not so state, but we shall assume that the official newspaper was a daily paper, which was issued on Monday. The complaint further shows that the notices were posted only *twenty-six* days next preceding the day of election.

These two omissions, it is claimed, and the trial court has so found, invalidate the election, and render it proper and legally necessary that no further steps be taken toward carrying out the object of the vote, notwithstanding that the complaint shows that more than three-fifths of the votes cast were in favor of the proposition submitted, but does not contain a single word to the effect that in any respect the election was otherwise than a fair, full and free expression of the popular will. But there was no formal

objection to the complaint, and the answer coming in a demurrer was interposed to it on the ground of insufficiency, and this demurrer the court sustained. The answer, in response to the allegations of the complaint upon the subject of the notice, was very full and direct, and showed the following facts: (1) That the time and places of holding the election were known to all the qualified voters in said city; (2) that the election was held at all of the voting places in the city in pursuance of the notice given by the clerk; and (3) that 5,107 votes were polled. The substance of this showing was that everybody qualified to vote had notice of the time and place of the election, and that a substantial body of the electors actually took part in it. Therefore, in passing upon this question, we have the single proposition whether the failure of the clerk to exactly comply with two requirements made by the ordinance, viz., that the publication should be for the thirty days next preceding election day, and that the notice should be posted, should avoid the popular action expressed under the supposition that all things had been done regularly.

This election was held under the mandate of the constitution, art. 8, § 6, and the internal improvement act of 1890, § 2 (Laws 1889–90, p. 521), the former of which prescribed nothing in regard to notice, while the latter requires thirty days' publication of the notice in each issue of the city paper. It seems that the court below based its ruling on this point somewhat, at least, upon the ground that this action is brought against the members of the sinking fund commission, who are to act under and by virtue of the authority contained in ordinance 790. It is true that the city charter (§ 84) provides that this commission shall negotiate city bonds in accordance with the provisions of the ordinance authorizing such bonds, and § 5 of the ordinance contained directions for their guidance in that matter; but the commission under the charter have nothing

to do with either the election or the ascertainment of the result. They do not even issue the bonds, that duty devolving upon the mayor, with the attestation of the clerk and comptroller. The city council, by § 23 *et seq.* of the charter, makes the official canvass of all elections and declares the result, so that the commission need look no further for *prima facie* authority to act.

But it would do no good to decide this case upon any such narrow ground. The bottom question is, Is literal compliance with the formalities prescribed for giving notice in this kind of an election a *sine qua non?* Certain rules as to notice of elections have become well settled, and none of them are better settled than that the formalities of giving notice, although prescribed by statute, are directory merely, unless there is a declaration that unless the formalities are observed the election shall be void.

"It is a canon of election law that an election is not to be set aside for a mere informality or irregularity which cannot be said in any manner to have affected the result of the election." Dillon, Mun. Corp., § 197, n. 3, and cases cited.

It is not pretended that the omissions in this case had any effect whatever on the result, or that a single vote additional would have been cast if the clerk had followed the ordinance to the letter; and the answer expressly negatives any possibility of any such outcome, which the demurrer admits to be true. Learned counsel for the respondent, however, does not controvert the general proposition here laid down, but insists that because this was an election to authorize bonds a rule of strict construction should be adopted. But we think that the most that can be said of it is that it was a special election, and is to be governed by the rules applicable to special elections. Only one case is cited for our consideration on this point — *Harding v. Rockford, etc., R. R. Co.*, 65 Ill. 90. That was a railroad aid

bond case, and the statute required thirty days' notice, but no notice whatever was given. The opinion of the court stated the ground of the decision as follows:

"Such municipalities were not created with the view to engage in commerce, or to aid in the construction of railways, but for governmental purposes only. When they exercise the functions given by the statutes under consideration, the powers granted must not only be clearly conferred but strictly pursued. If the mode prescribed for carrying into effect the right to issue bonds is not complied with *in all material matters*, then the bonds should not be issued."

In a later case, *Jacksonville, etc., R. R. Co. v. Town of Virden*, 104 Ill. 339, the same court in speaking of the rights of bondholders said:

"That depends upon whether there has in fact been *a substantial compliance* with the requirements of the law authorizing the election to be held, otherwise it would be in the power of the clerk to invalidate bonds clearly legal and binding, by refusing to make a record that the order was made or notice given."

In *Town of Coloma v. Eaves*, 92 U. S. 484, a case of the same class, the opinion recites the provisions of the statute at length, and dismisses them with the remark that "most of these provisions are merely directory." The substance of all the cases upon this subject, of which we have examined many scores, is that there must be a substantial compliance with the requirements of the law, and the same rule should apply here although the object sought to be accomplished here was strictly within the legitimate purposes of the municipal corporation. The reasons for the holdings of the courts on this subject are that only jurisdictional matters are mandatory. *Dishon v. Smith*, 10 Iowa, 212, is an oft-quoted case upon this point, and it was there said:

"It is an error to regard this as a jurisdictional matter. This idea pertains to cases where the court acts judicially

and in matters between party and party, and not to one of the nature of the present one, which is a vote of the people. Nor does the want of such notice invalidate the election. In matters of such a public nature the observance of each particular is not held a prerequisite to validity. And it is the general rule of law, that statutes directing the mode of proceeding of public officers, relating to time and manner, are directory.''

That was a case of a special election to remove a county seat. Rev. Stat. Iowa, 1860, § 231. As to special elections to fill vacancies in offices, see *Wheat v. Smith*, 50 Ark. 266 (7 S. W. Rep. 161), where it was held that a statute requiring publication and posting of notice was substantially complied with by posting only, the fact of the election having been generally known, and about two-thirds of the usual vote having been polled. In the matter of the incorporation of Anacortes the United States circuit court of this district held that the omission from the election notice of the number of inhabitants residing within the boundaries of the proposed corporation was an immaterial irregularity, although the statute required that the notice contain it. *Smith v. Commissioners*, 45 Fed. Rep. 725.

The power was conferred upon the city to issue these bonds by the statute, with the limitation that a vote of the people should first be taken to see whether they consented; and, they having consented, no mere negligence of the clerk or the publisher should be allowed to defeat their will. In this connection, however, we would not have it understood otherwise than that officers ought, in all such matters, to follow the letter of the law governing them, whether they deem any particular requirement material or not. Our holding is, only, that where, as in this case, there was a substantial compliance with the law, and there was a fair election, the result cannot be defeated by technical irregularities.

The second point in the case, upon which the court below

also ruled against the appellants, grows out of the fact that
the election was not held a few days earlier.    The amount
of the proposed bonds does not exceed five per cent. of the
city assessment for the year 1892; but, under the charter
of the city of Tacoma, the beginning of the assessment
year is January 1st.    The assessor is required to make up
and deliver to the city clerk an assessment roll of city
property on or before March 1st.    On the first Monday in
March the board of equalization, which is a committee of
the council, commences its sessions, and sits three weeks;
within three days after the board of equalization finishes
its business, the city clerk, who is *ex officio* clerk of this
board, must deliver the roll to the comptroller (who is *ex
officio* assessor), who must add up the columns of valuation
and enter the total valuation of each description of prop-
erty in the roll, and the total value of all the property as-
sessed and listed thereon, and, thus equalized and added
up, deliver the roll to the city council.    At the first regu-
lar meeting of the council in May, or as soon thereafter as
practicable, it must levy the annual taxes.    Now, on the
11th day of April, when this election was held, the assess-
ment roll had been made up containing some two hundred
thousand different items; the board of equalization had
finished its sessions March 27; the clerk had delivered the
roll, with the changes made by the board to the comp-
troller; and the comptroller was proceeding to make the
footings required by the charter, prior to delivering the
roll to the council, which he did, so that the tax was levied
May 13.    When this roll came to be footed it was found
that the assessed value of all the property upon it was
$41,608,050, five per cent. of which is $2,080,402.50, or
$69,597.50 less than the amount of the proposed bonds,
and the trial court held with the respondent that, under
the act of 1890, the city was limited in its power to issue
bonds for water works and a lighting plant to five per

cent. of the roll of 1893, rather than of the roll of 1892; that the roll of 1893 was complete on the 27th of March, when the board of equalization finished its work; and that it was incompetent for the city to take a vote on the 11th day of April to issue more than $2,080,402.50 worth of bonds.

The argument in support of this proposition is that, although there had been no official ascertainment of the total amount of the taxable property in the city, it was at all times after March 27th possible for anyone, by adding up the columns of figures in the fourteen volumes of the roll, to ascertain the total to a mathematical certainty. In short, the maxim "*id certum est, quod certum reddi potest*" is applied to the case, and, although it is not contended that at the date of the election anybody knew what the total was, an estoppel by relation is held to render the election void. But we believe that upon examination it will be found that the ancient and most valuable maxim above quoted, was invented for the interpretation of deeds and written instruments, with a view of sustaining them against an otherwise probable failure, and can have no just application here. Broom, Legal Maxims, 622. If the "assessment" mentioned by the constitution, art. 8, § 6, and the "assessment roll" intended by the act of 1891 (Laws, p. 326), amending the act of 1890 (which must necessarily be the same thing), mean merely the itemized list of property, with values opposite, as it comes from the hands of the board of equalization, then very good; that is the end of it, and there is no need of applying maxims. The application of the maxim, and its possible adaptedness, do not prove that the thing to which it is applied is what is meant by the law.

Parenthetically it was said above that the "assessment" of the constitution and the "assessment roll" of the statute must be the same thing, and it is true; because the

legislature has no power to make the test of a bond issue depend upon anything else than the "assessment" named in the constitution. Now, a great deal is said in the constitution about the indebtedness of municipal corporations, including counties, towns and school districts, and the validity of all their debts is made absolutely contingent upon their being kept within the limits prescribed, all of which are measured by the "last assessment." And this "assessment" must refer to the actual aggregate of all taxable property to be sometime and somehow ascertained from year to year; and the word that was used was taken in view of the universal fact that periodically, under some law, all of these corporations take an account of their property for purposes of taxation, which is commonly called an assessment. All taxes, however, are levied upon totals, no account being taken of separate parcels, and the levies are made by percentages. As a general rule tax laws require some one to officially foot up and certify the total of the rolls, and our statute did this at the time of the adoption of the constitution (Code of 1881, § 2883), and all subsequent revenue laws have required the same thing, the auditor being the officer upon whom that duty devolved. And so in this city charter, the comptroller is the officer whose footing the council must have before them when they make the tax levy.

We think the constitution had fully in view this customary official ascertainment of the taxable property in a municipal corporation when it was adopted. The indebtedness of counties, cities and school districts being entirely dependent for its validity upon its not exceeding the limits prescribed, several things must have been regarded — (1) The safety of public securities. (2) The necessity that such corporations often have for borrowing money. (3) The rule that negotiable securities of this kind cannot be issued without express statutory authority. (4) The com-

pulsion that such corporations are under to know the limit of their right to incur indebtedness, and the like burden which is thrown upon buyers of their bonds to know that no statutory or constitutional condition precedent has been violated.   (5) The fact that such a corporation is liable to be obliged to resort to bonding at any time.   (6) The further fact that to authorize and negotiate an issue of bonds necessarily consumes several months.   All of these considerations point to the conclusion that the idea of some definite time and method of ascertaining the aggregate of taxable property, that is, the "assessment," must have been implied in the constitutional provisions.   But how is it here?   These fourteen volumes, containing thousands of pages of unfooted columns, still in the hands of officers who are working upon them, furnished no information.   A taxpayer might, while they were in this condition, have the right to inspect them to see how much he or his property was assessed, but he would have no right whatever to demand possession of them, or any of them, for the purpose of adding up the assessments.   In a limited sense they were records, but they were not such *public* records as would answer the demand of any one seeking to know what the debt capacity of the city of Tacoma was, for until May 13th they did not bear upon their face what the charter required, viz., the footings and totals ascertained by the comptroller.   Respondent says that he had no difficulty in finding out what the total was on May 11th, and he alleged the total, and it is not denied in the answer.   It may be so; the total may have been known in the comptroller's office before that date.   But it is not alleged or contended that the total was spread upon the record, and that the completed assessment was delivered to the council then, much less April 11th, a month before.   In such case, how was any one to know after March 27th, when it is agreed that the board of equalization finished its work upon the

itemized values, what the assessment of taxable property
in Tacoma was for 1893 until the complete assessment was
delivered to the council? In this we speak of a practical
knowledge which all persons alike were free to obtain.
And how, then, could the affairs of such a corporation be
run even from day to day, if there be a period of a month
or more every year when nobody can know whether the con-
tracts of a city or a county are valid or utterly void? For
this ruling concerns not only bonded indebtedness but the
ordinary indebtedness within one and one-half per cent. of
the taxable property. It is no strange thing at all for a
city to approach very near to its 1½ per cent. limit and re-
main there for months; and, under a well-ordered system,
the books should be in such condition that at the close of
business every day the exact amount of liabilities should
be known to a cent. But it is proposed to take one or two
months in every year — whatever period is necessary to get
the books in shape for the levy of taxes after the assess-
ments have been equalized — and say that during that
period there shall be no guide or certain reliance for the
transaction of public business; or at most only the unoffi-
cial *dictum* ·of some one who may have run hastily over
hundreds of thousands of figures. It cannot be conceded
that the constitution intended any such thing. It is not
reasonable, and what is not reasonable, in the absence of
positive enactment, is not law. The appellants would have
us hold that the assessment is not ascertained until, under
this charter, the taxes are extended and the rolls delivered
to the treasurer for collection; but logically we think that
should not be the construction. When the total assessment
has been officially ascertained and deposited where the law
says it must be, viz., with the council, it becomes an open,
authentic book, upon which all may rely with the certainty
which the law contemplates; and from that time it should
be regarded by the agents of the city.

We hold, therefore, that the election was valid, upon the points presented.

The complaint contained a claim that the election was void, because, at the same election, and by the same ballot, certain bonds for a bridge were voted.  But the purpose for which these bonds are to be issued is one not within the provisions of the act of 1890, and the only point made is that two such diverse propositions could not be submitted at the same election.   The superior court did not rule upon this, and we do not think it should be sustained.

But we must sustain the injunction as to all that portion of these bonds which exceeds five per cent. of the new assessment, viz., $69,597.50, or rather seventy thousand dollars, as they are required to be of the denomination of one thousand dollars each, until the taxable value of the city's property reaches an amount sufficient to justify the issuance of this excess.   The language of the statute requires this. The authority conferred by the act is, upon receiving the assent of the voters, "to become indebted and issue bonds:" *Provided*, That the indebtedness shall not exceed five per cent.   A contract entered into before the new assessment became operative might have been enforced to the full extent of the authority afterward, and bonds to meet it might be issued; but here there is no contract, at least for more than the cost of the old works, and it is now proposed to make the only contract for the excess of $400,000 by the bonds themselves.   In the meantime, the new assessment, always a condition subsequent, has interposed and reduced the constitutional amount.   It may be said that this will overturn the estimate made by the council for the cost of extensions, and that the result of the election might have been different if it had been known that the means available would be so much lessened.   But it was not implied by any of these proceedings that the city was obliged to expend the full amount of the estimate.

nor that the whole or any part of it should be expended at once; nor, indeed, would there seem to be any compulsion to exercise upon the city, which, by its council, may determine to do nothing, at least so long as the bonds are not sold. That body will have to be the judge whether, with the reduced sum immediately available, it will go on with the scheme. So far as the law of the case on respondent's side is concerned it is the same as if, upon calling for bids, none were received for more than a portion of the issue. He could not interfere to prevent the sale of those bid for.

Appellant asks the construction that indebtedness for water works, light plants and sewers is not limited to five per cent. of the assessment, but may be of any percentage so long as the total of indebtedness for all purposes does not exceed ten per cent. We held that in *Metcalfe v. Seattle*, 1 Wash. 297 (25 Pac. Rep. 1010); but that was before the amendment of 1891, which, we think, clearly restricted such indebtedness to five per cent. only. Nor can we take into account the fact that the general fund in the city treasury contains $148,000. These bonds are not payable out of the general fund, but out of special taxes to be levied for the purpose. Act of 1890, § 4.

· Judgment reversed, with directions to enter a new judgment in accordance with this opinion, in case no issue of fact is taken upon the answer.

HOYT, ANDERS and SCOTT, JJ., concur.

DUNBAR, C. J. (*dissenting*).—I am unable to agree with the construction placed upon the law governing this case by my associates. This court in my judgment has already gone to the extreme limit of liberality in construing constitutional checks upon municipal indebtedness, and, I, as one member of the court, cannot see my way clear to go beyond that limit, which I think the court is compelled to do

to sustain this transaction.  The assessment was as com-
plete upon the 27th day of March as it could have been
made; the property of the city had been assessed; the
value had been ascertained and stated by the assessor; that
value and the actual amount of the assessment had been
made fixed and certain by the action of the board of equal-
ization.  It could not be changed.  It was an official state-
ment of the value of the property of the city.  The footing
up and totalizing could add nothing to it, and could take
nothing from it.  That is simply a clerical exhibit of a
fact already in existence.  It is the *fact* which the con-
stitution deals with, not the mere clerical ascertainment or
publication of that fact in any particular method.  Such a
detail is not worthy of constitutional consideration, and in
my judgment never was considered by the framers of the
fundamental law.  I am not at all disturbed by the fear
that "there may be a month or more in each year when
nobody can know whether contracts of a city or county are
valid or wholly void."  The energetic desire of cities in
this state to incur indebtedness will easily overcome all such
trifling obstacles as the ascertainment of the total footing
of the assessment roll.

I think the judgment of the court should be affirmed.