[No. 10822. *En Banc.* October 26, 1912.]

SAM B. HILL, *Petitioner,* v. I. M. HOWELL, *Secretary of State, Respondent.*[1]

COURTS—APPELLATE COURTS—JURISDICTION—MANDAMUS TO STATE OFFICERS—ELECTIONS—CONTEST. The supreme court has original jurisdiction to issue a writ of mandamus to the secretary of state to compel him to certify to a nomination; the jurisdiction extending to state officers who are proceeding contrary to law, although the issues involve only the private rights of individuals contesting for the office (CHADWICK and ELLIS, JJ., dissenting).

ELECTIONS—IRREGULARITIES—ELECTION BOARDS—RETURNS—REVIEW BY COURTS. Under Rem. & Bal. Code, § 4942, providing that no irregularity or improper conduct by election judges shall invalidate an election unless a person is thereby declared elected when he did not receive the highest number of legal votes, a contest of a primary election cannot prevail by reason of the fact that in one election precinct the polls were not kept open the full time and several electors were wrongfully excluded, one of whom would have voted for the contestant, or that one irregular vote was received by the

[1] Reported in 127 Pac. 211.

contestee, where making due allowance for such votes, the contestee still received the highest number of votes, and there was no showing of fraud or intentional wrong or that the irregularities influenced the final result; nor should the votes of the precinct be thrown out because the polls were closed for the noon hour without any guard over the ballot boxes, in the absence of a showing that any harm resulted (MOUNT, C. J., GOSE, and MORRIS, JJ., dissenting).

ELECTIONS—CONTEST—ELECTORS WRONGFULLY EXCLUDED. In an election contest, the vote of an elector wrongfully excluded must be counted for the candidate for whom he testifies he would have voted; but can be counted for neither candidate when it is not shown how the elector would have voted.

ELECTIONS—CONTESTS—QUALIFIED ELECTORS. In an election contest, votes shown to have been cast for a candidate by electors who could not read or write the English language, must be deducted from the number of votes cast for such candidate.

SAME—QUALIFIED ELECTORS. Electors who can read the English language sufficiently to read the names of the different candidates and mark them without extrinsic aid are qualified electors, although they are unable to read English fluently or understandingly.

SAME—CONTESTS—QUALIFIED VOTERS—EVIDENCE—ADMISSIBILITY. In an election contest, evidence that an unqualified voter had stated to the witness that she had voted for a certain candidate is inadmissible as hearsay.

Application filed in the supreme court October 15, 1912, for a writ of mandamus to compel the secretary of state to certify a nomination for the office of judge of the superior court of Douglas and Grant counties. Denied.

*Merritt, Oswald & Merritt,* for petitioner.
*Frank Reeves* and *W. E. Southard,* for respondent.

FULLERTON, J.—The petitioner, Sam B. Hill, and one R. S. Steiner were candidates on the nonpartisan judiciary ticket at the general primary election held on September 10, 1912, for the office of judge of the superior court for the district comprising the counties of Douglas and Grant; the persons named being the only candidates for such office. The county canvassing boards found from the returns of the several voting precincts of the counties that Sam B. Hill had

received 1,222 votes for the office of judge, and that R. S. Steiner had received 1,227 votes therefor, and made return thereof accordingly to the office of the secretary of state, after which the state canvassing board canvassed the returns and found the same to be correct.

The petitioner, Hill, conceiving that such gross irregularities had occurred in the manner of conducting the election in Beverly precinct, in Grant county, as to require rejection of the returns from that precinct, and that certain illegal votes had been cast and counted for his opponent in Wheeler, Quincy, Moses Lake, and Warden precincts, in Grant county, and Waterville precinct, in Douglas county, applied to this court for a writ of mandamus against the secretary of state to compel that officer to certify his name as the name of the person duly nominated at such primary election for the office of superior judge and the person whose name was entitled to be printed upon the official ballots of those counties to be used at the coming general election as the duly nominated candidate for such office, instead of the name of R. S. Steiner, which name he alleges the secretary of state intends and threatens to certify as the name of the person so duly nominated; alleging further that, if the returns from Beverly precinct be rejected and the illegal votes cast for his opponent be not counted, it will be found that he received a clear majority at the primary election.

On filing the application, this court issued an alternative writ of mandate against the state auditor, together with a commission appointing a commissioner empowered to take such testimony as either party desired to offer concerning the matters charged in the application, causing the writ to be served upon the opposing candidate, with leave to him to show any matters tending to prove the validity of his own nomination or the invalidity of that of his opponent. The commissioner so appointed heard the allegations and proofs of the parties and made and returned into this court the following findings of fact:

"(1)   At the primary election for the nomination of candidates, held on September 10, 1912, there were only two candidates for the office of judge of the superior court for the counties of Douglas and Grant, said two candidates being the petitioner in this cause, Sam B. Hill, and R. S. Steiner, each of whom was and is possessed of the legal qualifications for such office and to be a candidate therefor.

"(2)   There is in the County of Grant a precinct named Beverly, at which on primary election day the polls, which were in charge of E. R. Sollberg, as inspector, and Mack Morrison and ————— Broderick as judges, were held at the school house in said precinct, and were opened about 10 a. m. of that day, and up to the noon hour about four ballots had been cast.   At the noon hour all three of the election officers locked the door and left the building for lunch, leaving the ballot box on the desk in the school house. Said Mack Morrison was away during the noon hour about half an hour, during most of which time he could see the polling place.   He returned to the polling place, and about an hour after doing so the other election officers arrived, and the polls were kept open thereafter until about five thirty to six p. m., at which time they were closed, and the count of the votes completed about seven to seven thirty p. m., at which time the election officers left the polling place.   Upon the return after noon of election officers Sollberg and Broderick, officer Morrison being already there, Morrison picked up a ballot saying it was the ballot of one Tapley, and Sollberg, who did not see Tapley that day, put that ballot into the ballot box.   After the polls closed on primary election day at said precinct three persons, Howard Dyer, ————— Welch and F. A. Neal, went to the polling place of Beverly about half past six for the purpose of voting, and one of them, to wit, Howard Dyer, asked of the election board the right to vote, but was told that the polls were closed.   The other two of said persons did not personally make any request to vote.   There are and were on primary election day one hundred or more qualified electors at and in the precinct of Beverly.

"(3)   On primary election day, September 10, 1912, there were eleven votes cast by electors voting general political tickets, ten of which also voted the nonpartisan judiciary

ticket, and in addition thereto thirteen other electors at said Beverly precinct voted the nonpartisan judiciary ticket.

"(4) One Jacob Dormaier, Sr., has lived in Grant county, Washington, nine years and cannot read the English language. One of the judges of the precinct at Wheeler precinct, at which the said Dormaier voted, instructed him how to mark his ballot, and it was by the voter marked in such a way as to be a vote for R. S. Steiner. Said ballot was cast.

"(5) One Casper Yesel has lived in the state six years; cannot read the English language; voted for judge at Quincy precinct, but does not know whom he voted for judge. Since said primary election said Casper Yesel stated to Sigismund Krenzel, a resident of Grant county, that he intended to vote for Judge Steiner, but that he did not know whom he voted for, but that he told the election judge he wanted to vote for Judge Steiner.

"(6) Thomas Chrast has been a resident of this state for fifteen years and was a voter at Moses Lake precinct, Grant county, at said primary election. Said Thomas Chrast can only read very small, short, plain words, and has considerable trouble to do even that. He voted for R. S. Steiner and marked his own ticket in doing so. Having his attention called at the time of trial to respondent's exhibit '1,' which exhibit was introduced in evidence while said Thomas Chrast was being examined, he quite readily identified and designated on said exhibit the name 'R. S. Steiner' and also the name 'Sam B. Hill.'

"(7) One John Radach has lived in the state eleven years and voted at said primary election at the precinct of Warden, in Grant county, Washington, for R. S. Steiner. He is unable to read understandingly from a portion of the reports of the decisions of the supreme court of this state, and reads rather poorly, hardly understanding it, from a second reader (school text book). He marked his own ticket at the time of voting, and being called upon while on the witness stand at this hearing, he picked out and designated readily upon request the names of R. S. Steiner, Sam B. Hill and Wallace Mount, as they appear upon the nonpartisan judiciary ticket, respondent's exhibit '1'.

"(8) Joseph Thomas Cooper, who had worked as a bartender in a saloon at Waterville, Washington, heard a Miss Hattie Cooper state to his mother that she, Hattie Cooper,

voted for Judge Steiner at said primary election. Said Hattie Cooper came from the state of Wyoming to this state, arriving at Waterville, Washington, on September 25, 1911.

"(9) Casper Yesel since said primary election did not tell one John Heather whom he wanted to vote for; and Mr. Heather told Casper Yesel how to vote; did not tell said Heather who he wanted to vote for, although Heather showed him how to mark the ballot."

At the hearing in this court on the return to the writ, counsel for the respondent questioned the jurisdiction of this court to issue the writ, or to try, in an original proceeding instituted in this court, the issues suggested by the petitioner's application for the writ. But without entering upon an extended discussion of the questions involved, a majority of the court think that the proceedings are sufficiently regular. By the express terms of the constitution, this court has jurisdiction in mandamus as to all state officers, and we have held that we have jurisdiction to issue such writs, and have repeatedly exercised such jurisdiction in cases where state officers were proceeding contrary to law, although the determination of the questions suggested by the writs involved the private rights of individuals. The most common examples of the exercise of jurisdiction in instances of this kind are found in the writs issued by this court against judges of the superior courts on the application of litigants in such courts. The writs are uniformly run against the court, notwithstanding the determination of the matters in question by the writs may involve the rights of individual litigants who are not otherwise parties to the proceedings.

On the merits of the controversy, we are of the opinion that the petitioner has not shown sufficient cause to warrant us in setting aside the returns of the canvassing boards. With reference to general elections, it is provided by statute, Rem. & Bal. Code, § 4942, that no irregularity or improper conduct in the proceeding of the board of judges, or any of them, shall be construed to amount to such malconduct as to annul or set aside any election, unless the irregularity or improper

conduct shall have been such as to procure the person whose right to the office may be contested to be declared duly elected when he had not received the highest number of legal votes.

Applying this provision of the statute to a case where the notice of an election published by the clerk of a school district notified the electors of the district that the polls would be open until 7 p. m. of the day of election instead of 8 p. m., as the statute required, this court said:

"Another reason for denying to the respondent any benefit of this mistake is, that his information contains no allegation that, had the polls been kept open an hour longer he would have been in any wise benefited by it. In all such cases there must appear some substantial reason why courts should interfere to overthrow an election, in the absence of any allegation of fraud, to the effect that, had there been a larger number of votes cast, the result would have been different." *State ex rel. Bailey v. Smith*, 4 Wash. 661, 30 Pac. 1064.

In *Williams v. Shoudy*, 12 Wash. 362, 41 Pac. 169, we held that a resolution calling for an election to be held between the hours of 9 a. m. and 7 p. m. did not avoid an election so held although the notice of election published specified that the election would be held between the hours of 9 a. m. and 6 p. m. In *Seymour v. Tacoma*, 6 Wash. 427, 33 Pac. 1059, we held that the posting of the notices of an election for twenty-six days preceding an election, whereas the law authorizing the election provided that such notices should be posted for thirty days did not vitiate the election in the absence of a showing that such irregularity in some way affected the result. *Richards v. Klickitat County*, 13 Wash. 509, 43 Pac. 647; *State ex rel. Mullen v. Doherty*, 16 Wash. 382, 47 Pac. 958, 58 Am. St. 39; *Hesseltine v. Wilbur*, 29 Wash. 407, 69 Pac. 1094.

The statute cited was enacted and the cases decided, it is true, with reference to general and special elections where

20—70 WASH.

public officers were to be or were elected, or where some question was submitted for ratification or rejection by the people, and not with reference to the direct primary law, which provides only for the nomination of candidates for public offices. But it has seemed to us that the statute and the cases are in point by analogy. Surely no harsher rules should apply to the latter election than the former; and if it be legitimate in the one case to inquire whether or not the irregularity in any way affected the result of the election, it ought to be legitimate to so inquire in the other. It will be remembered that no charges of fraudulent conduct or wilful misbehavior are made or proven against any of the officers of the election who were guilty of the irregular conduct found by the commissioner. It is conceded that they acted in the utmost good faith, and that their conduct was the result of ignorance on their part of the requirements of the election statute and not from any corrupt motive. It must be remembered, also, that the candidate Steiner was in no way responsible for the acts of these officers. On the contrary, he was as blameless in the matter as was candidate Hill; and since it is evident that many legal votes were cast for him in this precinct which will be denied him if these votes are rejected—sufficient to change the result in the particular case—common justice requires that these votes be rejected and be not counted only in case the exigencies of the matter admit of no other alternative.

Turning to the immediate question, it seems to us that there is no reason to reject the returns made from Beverly precinct in their entirety. It is clear that there was but one vote that can be said to be irregular that actually got into the ballot box, namely, the vote of elector Tapley. But neither the findings of fact, nor the affidavit made by Tapley in support of the application for the writ of mandamus, although the affidavit sets forth the facts fully, show for whom the elector voted. If this was an illegal vote it was proper to show for whom the elector voted, and since the fact

is not shown, it must be treated between the parties as a legitimate vote. Neither of the candidates were responsible for the manner in which the vote got into the ballot box, and both being innocent of wrongdoing, it would be an injustice to charge the error to either of them.

Of the three persons who applied to vote after the officers of the election had closed the polls, it is found that one of them would have voted for the petitioner. As these persons were qualified electors and appeared at the polls at a time when the statute required the polls to be open, they were wrongfully denied the right to vote, and since it is found that one of these testified that he would have voted for the petitioner, the vote should be counted for the petitioner in determining whether he has been wronged by the action of the election officers. But the same rule does not apply to the other electors. None of them testified for whom they would have voted; indeed, they did not even say they would have voted the judiciary ticket at all. Again applying the rule above announced; it would be an injustice to count their votes for either party, since neither of them was responsible for the causes which denied these electors the right to vote.

But counsel argue that the vote of the precinct ought to be rejected because of the fact that the polls were closed for the noon hour, without any guard over the ballot boxes. But it is not shown that harm resulted from this fact. The door of the building in which the ballot boxes were left was locked during the interim, and there is absolutely no proof that the ballot boxes were in any manner disturbed. On the contrary, proofs or inferences are all the other way. By the statute, poll lists are required to be kept by the election officers, and the returns of the election should show a name of an elector for each ballot in the ballot box. There is no claim that there was any discrepancy in the returns in this respect, and this fact precludes the idea that the ballot boxes were tampered with during the absence of the election officers.

"Receipt of votes during the absence of some of the members of the board of judges does not vitiate the election; the law not requiring all the members to be present during all the time voting is in progress." *Packwood v. Brownell*, 121 Cal. 478, 53 Pac. 1079.

"It was no doubt the intention of the legislature that the polls should remain open during the entire day of the election, between the hours specified in the statute for opening and closing; and good policy, as well as the convenience of the voters, would seem to require that this legislative intent should be observed. But we are not prepared to say that the closing of the polls for the hour spent at dinner, by the officers of the election, in these three townships, under the circumstances disclosed in this record, is, in law, sufficient to invalidate the elections and disfranchise the voters who did deposit their ballots in the boxes. The statute in this respect may be regarded as *directory*, and a departure from the strict observance of its provisions does not necessarily invalidate the election, where it appears that no fraud has been practiced, and no substantial right violated. A case might occur that would require the entire vote of an election precinct to be set aside as invalid, but we are of opinion that this is not such a case." *Fry v. Booth*, 19 Ohio St. 25, 27.

"Where an election appears to have been fairly and honestly conducted, it will not be invalidated by mere irregularities which are not shown to have affected the result, for in the absence of fraud the courts are disposed to give effect to elections when possible. And it has even been held that gross irregularities not amounting to fraud do not vitiate an election. Where the legislature declares a certain irregularity in election procedure to be fatal to the validity of the returns, the court will effectuate that command. And while the conduct of election officers may, although actual fraud be not apparent, amount to such gross negligence and such a disregard of their official duties as to render their return unintelligible or unworthy of credence. But the power to throw out an entire division is one which ought to be exercised with the greatest care and only under circumstances which demonstrate beyond all reasonable doubt that the disregard of the law has been fundamental or so persistent and continuous that it is impossible to distinguish what votes are lawful and

what are unlawful, or to arrive at any certain result whatever, or where the great body of the voters have been prevented by violence, intimidation, and threats from exercising
their franchise." 15 Cyc. 372.

"An election honestly conducted under the forms of law
ought generally to stand, notwithstanding individual electors
may have been deprived of their votes, or unqualified voters
been allowed to participate. Individuals may suffer wrong in
such cases, and a candidate who was the real choice of the
people may sometimes be deprived of his election; but it is
generally impossible to arrive at any greater certainty of result by resort to oral evidence, public policy is best subserved
by allowing the election to stand, and trusting to a strict
enforcement of the criminal laws for greater security against
the like irregularities and wrongs in the future." Cooley's
Con. Lim. (7th ed.), 934.

The conclusion reached concerning the irregularities of
the election board in this precinct requires the addition of
one voter to the vote of candidate Hill, reducing the majority actually returned for candidate Steiner from five to four
votes. It remains to inquire whether this difference is overcome by illegal votes cast for the successful candidate in the
remaining precincts. Since in this state it is the constitutional requirement that a qualified elector shall be able to
read and speak the English language, it is plain that Jacob
Dormaier, Sr., who voted in Wheeler precinct, and Casper
Yesel, who voted in Quincy precinct, were not qualified electors, as neither of them could comply with this requirement
of the constitution. One of them voted for candidate Steiner
unquestionably, and we think there can be but little doubt
that the other did so also. These votes must be deducted
from the total counted for Steiner. With reference to
Thomas Chrast and John Radach, we think they are qualified electors. They were able to read the names of the different candidates on the election ballot and to mark them without extrinsic aid. While they were not able to read English
fluently, they could read it to some degree; and as the constitution does not itself lay down any restriction in this re

gard, the courts should incline towards liberality in determining who are qualified under the rule.

With reference to the claim that Hattie Cooper voted for candidate Steiner in Waterville precinct, we think there is no sufficient proof of the charge. Were the alleged voters on trial for illegal voting, her declarations would be competent evidence against her; but we are clear that such declarations are incompetent in a contest between rival candidates in a proceeding brought to determine which of them received the majority vote. *Gilleland v. Schuyler,* 9 Kan. 569.

The necessity for an immediate decision of the question presented prevents our reviewing the many cases cited by counsel from other jurisdictions which are thought to be against the conclusion we have reached. An examination of the cases, however, has led us to believe that there is a conflict of decision on practically all of the questions involved. This being true, we prefer to follow what seems to us to be the more liberal and just rule enjoined by our own statutes and sanctioned by the decisions of this court hereinbefore rendered.

These considerations lead to the conclusion that candidate Steiner, after all votes in his favor are deducted which can be reasonably questioned, still has a majority of the legal votes cast at the primary election for the office for which he *is a candidate, and is entitled to have his name certified by* the respondent as such candidate. The alternative writ of mandate heretofore issued will therefore be quashed, and the application for a peremptory writ be denied.

MAIN, CROW, and PARKER, JJ., concur.


CHADWICK and ELLIS, JJ. (concurring in result)—The opinion of the court shows this proceeding to be an election contest and nothing more. This court is clearly without jurisdiction.

GOSE, J. (dissenting)—I think that Beverly precinct should be excluded in the canvass of the votes. This would give the relator a majority, and the nomination. On the other questions discussed, I agree with the view taken by the majority. Want of time prevents a discussion of the questions. I therefore dissent.

MOUNT, C. J., and MORRIS, J., concur with GOSE, J.