[Civil No. 4453. Filed May 4, 1942.]

[125 Pac. (2d) 445.]

W. R. WHITMAN, Appellant, v. HARRY M.
MOORE, Individually, and as Secretary of State
of the State of Arizona, Appellee.

Messrs. Moeur & Moeur, and Mr. M. L. Ollerton, for Appellant.

Mr. Joe Conway, Attorney General, and Mr. Earl Anderson, Special Assistant Attorney General, for Appellee.

Messrs. Cunningham & Carson, and Mr. Joseph T. Melczer, Jr., of Counsel, for Appellee.

LOCKWOOD, C. J.—W. R. Whitman, plaintiff, brought suit in the superior court of Maricopa county, seeking to enjoin the secretary of state, defendant, from placing on the ballot at the general election a certain initiated measure relating to education, on the ground that, while the petitions requesting that such measure be placed on the ballot on their face contained the required number of names, they were insufficient in that so many of these names were not legally placed thereon, that the valid signatures fell below the constitutional minimum.

It was requested by plaintiff that a special master be appointed for the purpose of checking and investigating the sufficiency of these signatures, and the court issued an order appointing one, but declined to then enjoin the placing of the measure on the ballot pending the report of the master. The matter was brought before this court, and it was urged that it was impossible

to check the petitions before the general election and that if the measure was placed upon the ballot and approved by the qualified electors, under the rule in *Allen* v. *State,* 14 Ariz. 458, 130 Pac. 1114, 44 L. R. A. (N. S.) 468, notwithstanding that the petition was found to be insufficient, the case would be considered as moot for the reason that the electors had already approved the measure. We pointed out that the Allen case was based upon a situation where no attempt was made to question the sufficiency of the petitions before the election, and that since the present case was initiated as soon after the filing of the petitions as possible, we would not consider the question moot, even though it were not decided until after the election, and if it appeared that the measure had not been legally submitted, would hold that it had not become a part of the statutes, even though it had been approved by the voters at the election when it was submitted. At the election in November, 1940, the measure therefore appeared on the ballot and was approved by the electors by a very substantial majority.

The special master completed his investigation on January 27, 1941, and his findings were reported to the court March 4 of that year. The report was approved and adopted as the findings of the court, and on May 28 it entered its written findings of fact and conclusions of law. The general effect of these was to disqualify several thousand signatures to the petitions as invalid, but there still remained thereon a sufficient number of legal signatures to comply with the constitutional requirements for submitting an initiative amendment to the statutes. Judgment was rendered for the defendant, and the matter is now before us on appeal.

The question is one of considerable importance, not only as it involves the particular initiated measure,

but as providing a guide in all future cases involving the sufficiency of initiative, referendum, recall and, perhaps, nomination petitions. For this reason, we discuss the question, both generally and specifically, at some length.

The Act providing for the admission of Arizona into the Union was adopted June 20, 1910. By its terms it was the duty of the qualified electors of the territory to select a constitutional convention for the purpose of forming a Constitution for the proposed State of Arizona. Shortly before this time the general principle of that method of popular government known as the initiative and referendum had been adopted by several states, and the question of whether Arizona should follow their example or retain the old method of legislation exclusively by the legislature was a burning issue in this state. It is a notorious fact that the choice of delegates to the constitutional convention was fought out primarily upon this issue. The result favored the advocates of this method of popular government, and the records of the constitutional convention, together with the language of the new Constitution, show clearly that it was the opinion of the delegates who adopted and signed it that its provisions setting forth these principles were among the most important to be found therein. When the instrument was submitted to the voters for ratification, that issue was again the principal one before them and the Constitution was ratified by a very large percentage of the votes cast. Whether the attitude of the convention and the voters was wise is not for this court to say, but we are bound to take that attitude into consideration in determining the construction to be given to these provisions. The particular portions of the Constitution involved in the present case are subdivisions 1, 2, 6, 9

and 15, section 1, part 1 of article 4, and section 32 of article 2. They read as follows:

"§ 1. (*Initiative and referendum.*)—(1) (*Legislative authority.*) The legislative authority of the state shall be vested in a legislature, consisting of a senate and a house of representatives, but the people reserve the power to propose laws and amendments to the constitution and to enact or reject such laws and amendments at the polls, independently of the legislature; and they also reserve, for use at their own option, the power to approve or reject at the polls any act, or item, section, or part of any act, of the legislature.

"(2) (*Initiative.*) The first of these reserved powers is the Initiative. Under this power ten per centum of the qualified electors shall have the right to propose any measure, and fifteen per centum shall have the right to propose any amendment to the constitution."

"(6) (*Veto.*) The veto power of the governor, or the power of the legislature, to repeal or amend shall not extend to initiative or referendum measures approved by a majority vote of the qualified electors."

"(9) (*Procedure in filing petitions.*) Every initiative or referendum petition shall be addressed to the secretary of state in the case of petitions for or on state measures, and to the clerk of the board of supervisors, city clerk, or corresponding officer in the case of petitions for or on county, city, or town measures; and shall contain the declaration of each petitioner, for himself, that he is a qualified elector of the state (and in the case of petitions for or on city, town, or county measures, of the city, town, or county affected), his post-office address, the street and number, if any, of his residence, and the date on which he signed such petition. Each sheet containing petitioners' signatures shall be attached to a full and correct copy of the title and text of the measure so proposed to be initiated or referred to the people, and every sheet of every such petition containing signatures shall be verified by the affidavit of the person who circulated said sheet or petition, setting forth that each of the names on said sheet was signed in the presence of the affiant and that in the belief of the affiant each signer was a qualified

elector of the state, or in the case of a city, town, or county measure, of the city, town, or county affected by the measure so proposed to be initiated or referred to the people.''

''(15) (*Section to be self-executing.*) This section of the constitution shall be, in all respects, self-executing.''

''§ 32. (*Constitution to be mandatory.*)—The provisions of this constitution are mandatory, unless by express words they are declared to be otherwise.''

It is, of course, a mere platitude to say that the people are the supreme power in our system of government. The history of our Constitution and its adoption, to which we have previously referred, shows beyond the possibility of contradiction that the people themselves deliberately and intentionally announced that, by its adoption, they meant to exercise their supreme sovereign power directly to a far greater extent than had been done in the past, and that the legislative authority, acting in a representative capacity only, was in all respects intended to be subordinate to direct action by the people. We, therefore, think that when there is any doubt as to the requirements of the Constitution going only to the form and manner in which the power of an initiative should be exercised, every reasonable intendment is in favor of a liberal construction of those requirements and the effect of a failure to comply therewith, unless the Constitution expressly and explicitly makes any departure therefrom fatal.

A number of the states have adopted constitutional provisions based upon the same general principle of popular government, and they have been before the courts of the respective states repeatedly for construction on one point or another. The decisions on specific questions are in some conflict, but we think a careful reading and analysis of all these opinions show

that, with few exceptions, they follow the general rule of construction. As was said by the Supreme Court of Oklahoma in *Re Initiative Petition No. 23,* 35 Okl. 49, 127 Pac. 862, 866:

" . . . The right of direct legislation in the people must be administered by the officers charged with that duty in such manner as to make it operative. If technical restrictive constructions are placed upon the laws governing the initiation and submission of these measures, the purpose and policy of the people in establishing the same will be entirely defeated, and instead of becoming an effective measure for relief from evils, under which they have heretofore suffered, there will be naught but an empty shell and a continuation of the conditions for which relief in this manner has been sought. The people who circulate a petition to submit for the consideration of their fellow citizens, constitutional and statutory provisions for the most part are unquestionably animated by a purpose which to them and the signers thereof, at least, appears good. Those who circulate the petition will necessarily be drawn from the ranks of volunteers or those who, for a very small consideration, call attention to their fellow citizens to the measure proposed, and solicit their interest therein. Necessarily even with the best safeguards that can be thrown around the circulation of petitions, where such a large number of names are required, inaccuracies and technical departure from prescribed forms are certain to occur every time a petition is circulated. The people who sign the petitions often, if not generally, lack both convenience and the best writing materials to distinctly, legibly, and permanently attach their names thereto. All of these things are proper to be noted and taken in consideration in the administration of this law. It can be made effective or defeated by the officers charged with its administration, and it is our duty to sustain it, rather than destroy, if it can be accomplished within the law. The presumption is that petitions which are circulated, signed, and filed are valid. People interested as the circulators of these petitions, and the others who sign them, are acting in the capacity of legislators. They are members of the largest legis-

lative body in the state, and, where so acting, do so in a public or at least a *quasi* public capacity, and when so acting the law presumes the validity and legality of their acts, and even though it should be claimed that they were acting simply in a private capacity, until overcome by proof, their acts, involving the performance of ministerial or administrative duties, such as those performed in the circulation and signing of these petitions, are presumed to be legal and not fraudulent. . . .

" . . . These petitions, therefore, and the signatures thereto, are presumed to be valid, and the presumption obtains on the filing of the objections in the office of the Secretary of State that those who have signed them are legal voters of the state of Oklahoma, and this is the one provision that is the *sine qua non,* the substantial material element necessary in every case to constitute a valid signature, and the burden of proof to overcome this presumption should be and is, in every instance, upon the protestant, and, in the absence of any evidence of fraud, forgery, or other improper or wrongful conduct in securing the signers to the petitions sufficient to throw discredit upon the entire petition or upon a sufficient number, the same, in keeping with the presumption above noted, will be held valid. We do not mean to hold that the circulator's affidavit can be dispensed with, but that technical defects therein will not destroy the petition. . . . "

Subdivision 9, *supra,* sets forth the procedure required by the Constitution to place an initiated measure on the ballot. It requires that the petition "shall contain the declaration of each petitioner, for himself, that he is a qualified elector of the state . . . , his post-office address, the street and number, if any, of his residence, and the date on which he signed such petition." It also provides that it "shall be verified by the affidavit of the person who circulated said sheet or petition, setting forth that each of the names on said sheet was signed in the presence of the affiant and that in the belief of the affiant each signer was a qualified elector of the state, . . . " These provisions must, of course,

be complied with in order that the petition, on its face, be valid, and the questions for us to determine are whether the petitions on which the measure was based do so, and, if they do not, the effect of such failure.

■■ It is, of course, absolutely necessary that every petitioner shall be a qualified elector who is entitled to vote upon the law for, unless he is, the most meticulous compliance with form cannot make him a legal petitioner. *Ahrens* v. *Kerby,* 44 Ariz. 269, 37 Pac. (2d) 375. In addition thereto, his desire must be expressed in the manner provided by the Constitution. One of the mandatory requirements is that a petition must be "signed" by the petitioner, which we think means that either his name must be affixed to it by himself, and no one else, or, if he is prevented by physical disability, that his signature must be placed thereon by another in his presence and under his specific instructions. The name of one who is able to sign for himself, affixed by another, even though under his direction, is not, we think, a legal "signature."

■■ It is equally true that the remaining constitutional requirements of his "post-office address, the street and number, if any, of his residence," and "the date on which he signed such petition" must appear on the face of the petition. But it will be noted on examining the constitutional provision that there is no specific requirement that they be placed thereon by him with his own hand, such as is found in the statute of South Dakota which requires that "each elector shall add to his signature his place of residence, business, post office address, and the date of signing." Section 55.0401, South Dakota Code 1939. Our Constitution merely says that it "shall *contain the declaration* of each petitioner" as to his being a qualified elector and his "post-office address, the street and number, if any, of his residence, and the date on

which he signed such petition." It is obvious that the purpose for requiring the address of the petitioner is to afford a convenient method of checking whether he is a qualified elector, and the date is for the purpose of ascertaining that this was true at the time he signed the petition for, as we have held, the test of whether one is a qualified elector must be applied as of the date when he performs the act. *Lane* v. *Henderson,* 39 Ariz. 457, 7 Pac. (2d) 588; *Ahrens* v. *Kerby, supra.* Following the rule of liberal construction, since the constitutional provision does not either directly or by necessary inference require that this information appear in the handwriting of the elector, as is required for his name on the petition, we think that the information on this point may be placed upon the petition by the circulator thereof, upon the instructions of the elector, given at the time the information is written thereon.

■ Summing up the construction of subdivision. 9, *supra,* as applied to the petitioners whose names appear thereon, we think it is sufficient if the petitioner places thereon his valid, legal "signature," as indicated above, and his post-office, street and number, if any, and the date on which he signs such petition are placed thereon either by himself, or by another under his direction, and that these are the only mandatory requirements of the Constitution in so far as the petitioner's action is concerned.

■ The Constitution also provides that the petition be verified in a certain manner, and these requirements also are mandatory. If, therefore, it appears on the face of the petition that these various constitutional requirements have been complied with, the presumption is that the names appearing thereon are in all respects those of qualified electors and should

be counted in ascertaining whether it has been approved by the required number.

But it is not sufficient that the information required by the Constitution appears on the petition in the proper form and manner in order to constitute a valid signature. The petitioner must also actually be, at the date he signs the petition, a qualified elector, and this is a matter upon which the recitals of the petition are merely *prima facie* evidence and not conclusive. Anyone questioning the validity of the petition may, therefore, produce evidence to show that the petitioner was not, as a matter of fact and law, a qualified elector, and, if he was not, the signature must be stricken, notwithstanding that on its face it is sufficient.

And what is the effect if the petitioner or verifier fails to comply fully with the formal requirements of the Constitution? Does it prevent petitioner's name being counted under any circumstances, or may the lacking information be supplied otherwise? The ultimate substantive question obviously is whether the signer is in all respects a qualified elector, and all the requirements in regard to residence, date of signing, verification and the like are to assist interested parties to ascertain this fact. We think in reason, and considering the background of the Constitution, the intent of its framers and the people who adopted it was that the effect of a deviation from the constitutional requirements in any of these particulars as to the manner of furnishing the necessary information by either petitioner or verifier is not to make the signature void, but to destroy the presumption of validity, and place upon the one desiring to sustain the signature the burden of proving by evidence *aliunde* the petition that the signer was qualified in all respects. The fore-

going principles must be applied to all petitions under the constitutional provision.

The legislature has gone more into detail as to these initiative petitions in sections 60–101 to 60–104, Arizona Code 1939, but it has added nothing to the constitutional requirements affecting the petitioner himself, although it does provide many details as to the form of the petition and verification. These details, however, are expressly stated to require only substantial compliance, and it is not contended in the present proceeding that there was any material deviation so far as the petitions are concerned, though there is some as to the verification. We, therefore, proceed to apply these rules to the questioned signatures on the petitions involved herein.

The findings of fact of the trial court, which are not questioned by either party, divide these signatures into a number of different classes. The first class is composed of those persons who were not at the date they signed the petition registered in the precinct in which the addresses placed opposite their names were located. This requires a consideration of what are the qualifications of an elector. We have said in the case of *Lane* v. *Henderson, supra,* and *Ahrens* v. *Kerby, supra,* that one of the requisites is that the elector must have been registered in accordance with the registration law. Our registration law requires that one must register as of a certain precinct. Section 55–205, Arizona Code 1939. Sections 55–208 and 55–214, Arizona Code 1939, read, so far as material, as follows:

"*Change of registration.*—(a) Any elector who, not less than thirty (30) days preceding any primary or general election, removes from the precinct in which he or she is registered, to another precinct, before he shall be permitted to vote, shall make application to the recorder or to a justice of the peace for cancella-

tion of the former registration and shall register as a voter of the precinct to which he has removed. . . . ''

"*Registration necessary to vote.*—No person shall be permitted to vote unless his or her name appears of record as a qualified elector in both the general county register and in the precinct register or list of the precinct in which such person resides; provided that an elector who removes from one precinct to another within thirty (30) days preceding any primary or general election may vote in the precinct in which registered.''

It is obvious from these two sections that when a registered voter has removed from the precinct in which he is registered and has not transferred his registration to the new precinct in the manner required by law, he loses his right to vote in either precinct, with the exception that if the removal has been within thirty days preceding the election, he votes in the precinct in which he was originally registered. The finding of fact is that the persons signing the petition were not registered in the precinct in which they stated they lived. Under those circumstances, the law is explicit that unless a change in residence had occurred within thirty days of the election they were not qualified electors. The affidavits, on their face, all show that the signatures were affixed much more than thirty days before the election at which the initiative measure was to be submitted. We think the court, therefore, correctly rejected the names of the petitioners to whom this objection applied, in the absence of affirmative proof that their residence was incorrectly given in the petition and that, as a matter of fact, they were legally and properly registered in the precinct where they resided.

The second class of signatures which we consider is those where it appears that petitioners were not registered on the day they signed the petition in the county in which, according to their given address,

they resided. The same rule should apply to these as to names not registered in the proper precinct.

The next class is of those signatures which appear on a petition two or more times. It is true that a man declares he has not signed and will not sign any other petition for the same measure, but nothing in the law states that he shall be disqualified so far as one signature is concerned because he may have inadvertently affixed his signature to another petition for the same measure. In view of the multiplicity of petitions which are circulated before each election, it is not surprising that some honest citizens may become so confused by the number of petitions presented to them that they may inadvertently sign two or more for the same measure. This, of course, is carelessness on their part, but if they are legally entitled to sign, we think one signature should be allowed and the others stricken.

The next class is those whose names were signed by persons other than themselves. Applying the rule previously stated, unless it appears affirmatively that this was due to a physical disability of the electors, the names should be stricken.

The next class is those who give no post office address. We think the names should be stricken, in the absence of affirmative proof that the signer possessed all of the necessary qualifications of an elector.

In the next class are those who give no residence number or post office box opposite their signatures. The Constitution does not require the post office box of the elector in so many terms, and we know that many electors do have their mail delivered at general delivery. If the address given is a city which has city mail delivery to the street and number by the post office, we think, in the absence of a showing that the residence of the party has no street and number or that he has

all the qualifications of an elector, the signature should be stricken, but in the case of communities where there is no such free delivery, we think it must be presumed that the mere address of the post office, without the giving of a box or street number, is sufficient.

The next class is where the post office address given on the petition does not exist in the county where the signer claims to reside. In such a case, the signature must be stricken unless it be affirmatively shown that there was an inadvertent error in giving of the county and that the signer is actually a qualified elector.

The next class is of those names where no date was given opposite the signature. This date is required for the purpose of ascertaining whether the signer at the time he signed was a qualified elector. If no date is given, this cannot be ascertained from the face of the petition, and the name should be stricken unless it should be affirmatively shown that the signer did sign the petition on a date when he was in all respects a qualified elector.

The next class is where the names of signers whose names as they appeared on the face of the petition were materially different from the names on the back of the sheet in the affidavit of the circulator. The requirement that the names be placed on the back of the petition in the affidavit of the circulator is of statutory and not of constitutional origin. The purpose of the affidavit of the circulator is to establish by *prima facie* evidence that the signer has all the qualifications necessary, and we think that in the absence of an affirmative showing that the person whose name appears on the face of the petition is a qualified elector, the name should be stricken.

The next class is of those persons whose names appear on the face of the petition but do not

in any manner appear in the affidavit of the circulator. As we have stated, this provision in regard to the affidavit of the circulator is for the purpose of making a *prima facie* showing, and the signatures should be stricken unless it is shown affirmatively that the person whose name appears on the face of the petition is in all respects a qualified elector entitled to sign the petition.

The next class is of those whose signatures are illegible. We think these names should be stricken unless it be affirmatively shown that the person whose signature appears is in all respects a qualified elector.

The next class is those where the address of the signer is illegible. We think the same rule should apply in this case and the signature should be stricken unless it be affirmatively shown that the signer is in all respects a qualified elector.

The next class is where the name on the face of the petition is incomplete. It is not stated in the above just what is meant by "incomplete," but obviously if the signature is really incomplete so that the identity of the signer cannot be ascertained from the face of the petition, the name must be stricken, in the absence of proof as to the qualifications of the actual signer.

The next class is composed of those where there is no certificate of the circulator giving the names of the persons who signed the petition. This again requires that the names should be stricken in the absence of affirmative evidence that those signing were qualified electors.

The next class is composed of those where there is no notary certificate, seal or certification of the verification. The verification being incomplete, there is no *prima facie* showing by the circulator as required by law, and the names should be stricken un-

less it be affirmatively shown that the signers were qualified electors.

 The next class is composed of petitioners where there were more than twenty signers to a single sheet. This limitation of the number of persons who could sign a petition is statutory, and, therefore, directory rather than mandatory, and we think that the signatures, if otherwise in proper form, should be accepted.

 The next class is composed of one hundred fifty-eight sheets, containing some three thousand signatures, all circulated by the same person. The court found that the certificate of the circulator to sixteen of these sheets was false and unworthy of credit, but made no finding in regard to the balance. So far as these sheets were concerned, the same general rule applies and the names should be stricken unless it is affirmatively shown that the signers were all qualified electors. So far as the remaining sheets are concerned, while the question is of some difficulty, we think the better rule is that the fact that the circulator was found to have been guilty of fraud in other cases was sufficient to authorize the court, in its discretion, to refuse to accept her affidavit on the other sheets, under the rule of *falsus in uno, falsus in omnibus,* and that the names on the remaining sheets should be stricken unless it were affirmatively shown that the signers were qualified electors.

 The next is the class where there were several sheets on which the same person wrote two or more names, and the circulator must necessarily have known this to be true. The court found, and we think correctly so, that the verification of the circulator could not be considered. This necessarily had the effect of changing the burden of proof so that such names should be stricken unless it were affirmatively shown which were actually signed by qualified electors.

■ The next class is of sheets signed by married women under different names than those under which they were registered, as, for example, registering as Mary Ann Smith and signing as Mrs. John Smith. It is admitted that the person signing the petition was the same person registered under a different name in the precinct in which she resided. We think in cases like this that, while the presumption would be that the signature in different form than that of the registration should be stricken, if it were affirmatively shown that a properly registered person was the same as the one who signed under a different name, the signature should be accepted.

■ The next is the class where the signers' addresses showed that they resided in counties other than those shown by the affidavits of the circulators. This, of course, disqualifies the affidavit of the circulator as being *prima facie* evidence that the signer was a qualified elector, and the signature should be stricken unless it were affirmatively shown that the signers were qualified electors.

■ The next class is composed of signatures that were not followed by any date or were followed only by a partial date. We think these signatures should be stricken unless it be affirmatively shown that the persons signing were qualified electors at the date they actually signed the petition.

■ The next class is composed of signers where the post office address had been written by some one other than the signer, or had been indicated merely by ditto marks. As we have already said, the only mandatory requirement of the Constitution is that the address shall appear in the petition, and there is no requirement that it should be placed there by the petitioner. These names should be allowed. The use of ditto marks is a common one and the meaning of the

mark is not in dispute. This, in effect, is the same as writing the particular word or number appearing over the ditto mark. We think this cannot be misunderstood and is a substantial compliance with the law.

The last class considered is that where the circulators of a petition give their street addresses in the verification but do not include the cities and state. This requirement is statutory, and not constitutional, and a substantial compliance therewith is sufficient. The purpose of requiring the signature of the circulator is so that if any question arises in which his testimony is needed, he can readily be found. If, on the whole petition, it appears that the street and number given by the circulator, with the aid of the other information appearing on the affidavit, is sufficient so that the court could, with certainty, identify the address of the circulator, we think the verification is sufficient. Otherwise, the names should be stricken unless it is affirmatively shown that the signers are qualified electors.

This disposes of all the challenged signatures. It is apparent from what we have said that it affirmatively appears that the petition was signed by a sufficient number of qualified electors to require that the measure be placed upon the ballot, and the trial court correctly so found.

The judgment is affirmed.

McALISTER and ROSS, JJ., concur.