597 P.2d 1

Rose Marie JOHNSON, Sheila Jane Mony-
peny, Caroline Jessen, Carol Ann Christ,
Ronald L. Christ, M.D., Olga Schumack,
Gail Beeler, Harry Balley, L. A. Johnson,
Alvin L. Geren, Harvey D. Taylor, Fran-
cine C. Taylor, Cecil L. Jacobson, John
E. Power, Jon Jessen, Karl Dennis, Eliz-
abeth P. Keddie, Jess Baker, Richard W.
Grogget, Jr., Roland P. Beeler, Janice R.
Greer, and Gary A. Greer, Appellants,

v.

Leon H. MAEHLING, Yuma County
School Superintendent and Cara Betts,
Yuma County Recorder, and Kay Balm-
forth, Bernard Jesse, and Alice Smith,
Intervenors, Appellees.

No. 13739.

Supreme Court of Arizona,
In Banc.

June 11, 1979.

Ronald F. Jones, Yuma, for appellants.

Michael Irwin, Yuma County Atty., and Nebeker, Hunt, Stanley & Hossler by Robert J. Roberson, Yuma, for appellees.

HOLOHAN, Justice.

Appellants, two members of the Crane School Board of Trustees, Yuma County, attacked the sufficiency of the recall petitions filed against them. The Yuma County Superior Court found the petitions sufficient to mandate the recall election. The

case was brought on direct appeal to this court pursuant to A.R.S. § 19–208.04(B). We denied relief to the appellants in an order issued May 9, 1978 with a notation that a formal opinion would follow. The election took place on May 16. Appellees and appellee-intervenors then moved to dismiss this appeal on grounds of mootness. This motion was denied on September 7, 1978. Appellants are entitled to the written decision of this court setting forth the grounds for the denial of relief in their appeal. Ariz.Const. art. VI § 2.

Appellants had been duly elected to the Crane School Elementary School Board, a five-member board. A group of residents became dissatisfied with four of the board members and decided to initiate a recall. In order to secure petitions from enough voters to force a recall election, appellee-intervenors formed the Crane Citizens for Quality Education, whose purpose was to gather support for the recall movement.

Recall petitions were presented to Leon Maehling, Yuma County School Superintendent, for certification. The superintendent, relying on an opinion issued by the Yuma County Attorney, determined that a sufficient number of signatures on the petitions were submitted to mandate a recall election. He forwarded the petitions to the Yuma County Recorder, Cara Betts, for validation of the signatures. She examined the petitions, validating those signatures she found to be in order and striking those she found defective.

Appellee Maehling received the verified petitions from the County Recorder and found that the number of signatures was sufficient to authorize a recall election for all four board members in question. Subsequently, pursuant to A.R.S. § 19–205.01, the board members and their supporters convinced a number of the petitioners to withdraw their signatures. As a result, the attempt to recall board members Jessen and Keddie ultimately failed for lack of sufficient signatures. Mr. Maehling scheduled a recall election for the two remaining board members, Baker and Dennis.

Appellants challenged the actions of Maehling and Betts in the superior court, and after failing in that court filed an appeal with this court which also denied relief. The election was subsequently held, and both board members Baker and Dennis were recalled.

At the time this appeal was taken the parties stipulated that 14 issues would be briefed and argued. We will address each of these issues in the order in which they were originally stated.

*ISSUE 1.*

What number of signatures is required to force a recall election when the official being recalled was originally elected in an election in which voters were allowed to vote for two candidates for office?

The Arizona constitution provides for the recall of elected public officials. It states:

"Such number of said electors as shall equal twenty-five per centum of the number of votes cast at the last preceding general election for all of the candidates for the office held by such officer, may by petition, which shall be known as a recall petition, demand his recall." A.R.S.Const. art. 8 pt. 1 § 1.

A.R.S. § 19–201 contains essentially the same provision. The two school board members who were recalled had been elected simultaneously in an at-large election. Because two offices were to be filled, voters were each allowed to vote for two candidates in the election, with each candidate being eligible for either of two offices. The total number of votes cast for all candidates in the election was 2,802. Were we to apply the language of the constitutional provision literally, as appellants suggest, we would need to count every vote cast for all the candidates for both board positions, and then use that number to compute the number of signatures required to mandate a recall. Twenty-five percent of the votes cast would be 701. Requiring 701 signatures on the recall petitions would, in effect, require nearly half the number of voters who elected Baker and Dennis to sign petitions before a recall election could be

held. In the case of Baker, who won office by receiving 726 votes, the recall committee would need nearly as many voters to petition for Baker's recall as it took to elect him. Such a result was obviously not intended by those who drafted the constitution.

■ The purpose of the petition procedure is to avoid the expense of holding recall elections except in those cases where a significant showing of voter interest is demonstrated. The procedure is not intended to protect incumbents from being ousted by dissatisfied voters. Unlike many states which require an allegation of misconduct in office as a prerequisite to recall, Arizona's recall provision allows an official to be removed from office merely on the basis of a change in public opinion. *Abbey v. Green*, 28 Ariz. 53, 235 P. 150 (1925). Since the provision is for the benefit of the public rather than the officials, we construe the language liberally in favor of permitting recall elections.

■ The application of the constitutional requirement for twenty-five per centum of the number of votes cast for all of the candidates for the office held by the officer subject to recall is easily calculable when a single office is at issue. In those instances in which voters are permitted to vote for more than one candidate to fill several offices (school board, city council, etc.) the literal application sought by appellant causes an absurd result. In such elections we hold that the proper method of calculating the number of signatures required for a recall is to divide the total number of votes cast for all candidates by the number of offices to be filled at that election. It is readily conceded that the resulting number is an approximation because some voters may have chosen to cast one vote for a single candidate. We believe, however, that out of necessity and fairness the foregoing formula is more in harmony with the constitutional intent.

■ In the present case 2,802 votes were cast for all the candidates for both offices. Since two offices were being filled, we divide 2,802 by two which results in 1,401

votes being considered as cast for each office. Applying the constitutional provision to this number of votes, we find that 25 percent, or 351 signatures, would be needed to mandate a recall election. The recall committee filed 542 signatures for the recall of Baker and 545 for the recall of Dennis. Using this approach the school superintendent was correct in determining that the recall committee had presented enough petition signatures to warrant holding a recall election.

*ISSUE 2.*

Were the five deputy registrars involved in the recall properly appointed, and if not, did those five obtain the status of de facto registrars, thereby validating the registrations that they performed?

A.R.S. § 16–141 establishes the procedure by which the county recorder shall appoint deputy registrars. It provides that deputy registrars shall "be appointed from a list of eligible voters in the precinct, such list to be sent to the county recorder by the county chairman of each political party." In this case, the county recorder appointed five of the recall supporters at their own request.

■ Appellees have apparently conceded that the appointments of the five recall supporters as deputy registrars were beyond the authority of County Recorder Betts because none of the five had been nominated by a political party. Rather, appellees contend and the trial court found that the voter registrations in question should be deemed valid on the theory that the county registrars were "de facto" officers whose acts should be given legal effect because of the public's reliance upon them.

In *Olathe Hospital Foundation, Inc. v. Extendicare, Inc.*, 217 Kan. 546, 539 P.2d 1 (1975), the Supreme Court of Kansas discussed the definition of de facto officer. The court referred to three types of de facto officer, the third of which it defined as follows:

"An officer de facto is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice,

will hold valid, so far as they involve the interests of the public and third persons, where the duties of the office were exercised: . . . 3. Under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power or defect being unknown to the public." *Olathe Hospital Foundation, Inc. v. Extendicare, Inc.*, 217 Kan. at 558–59, 539 P.2d at 12–13.

In this case, not only the public, but the deputy registrars themselves were unaware of any irregularity in the appointment procedure. A significant number of voters were registered by these five deputy registrars. Tremendous confusion would certainly result from a declaration that these registrations were invalid.

Appellants in their brief argue that these deputy registrars "conspired" to "do ill to the Crane School Board members." They contend that, because the law of de facto officers arises strictly out of public policy to protect third persons, these deputy registrars may not take advantage of their "illegal" appointments. This line of reasoning totally misconstrues the concept of the recall election. The board members in question hold no vested right to their offices. *See State ex rel. Hall v. Vaughn*, 483 S.W.2d 396, 397 (Mo.1972); *Stone v. Wyckoff*, 102 N.J.Super. 26, 36, 245 A.2d 215, 220 (1968); *Montoya v. McManus*, 68 N.M. 381, 385, 362 P.2d 771, 774 (1961); *contra, Piver v. Stallman*, 198 So.2d 859 (Fla.App.1967). They serve at the pleasure of their constituency. The public, including those voters registered by the five deputy registrars, are entitled to determine whether these officers shall retain office. To void signatures on the recall petition would not merely prevent the deputy registrars from enjoying the benefit of their "illegal" acts, but would disenfranchise a significant number of citizens who have indicated a sincere desire to remove certain board members from office. We know of no principle of law or equity which would justify such a drastic infringement upon this constitutionally established right.

We hold that the registrars in question acted as de facto officers, and that the signatures of petitioners registered by them are therefore valid.

*ISSUE 3.*

■ Does the fact that deputy registrars accompanied petition circulators void those petitions?

Several of the deputy registrars accompanied petition circulators who went door to door soliciting signatures. Appellants contend that this invalidates those signatures.

A.R.S. § 19–205.02 makes it illegal for the deputy registrar himself to circulate a recall petition. Appellants argue that passage of this statute indicates the legislature's agreement with a previously issued attorney general's opinion, Op.Atty.Gen. No. 73–15(R–55) (July 27, 1973), which states:

" . . . We believe that the potential for fraud and coercion is so inherent in the intermingling of a citizen's right to register to vote, regardless of his party affiliation or his views on any particular burning issue of the day, and his right to sign, or not sign, a petition being circulated by the registration official, as to require that these petitions be presumptively rejected as inherently unreliable to show the free will of the people petitioning their government for redress. . . . [To rule otherwise] might result in making it possible for a recall election to be initiated by signers coerced into signing a recall petition so they could be properly registered to vote."

Appellants argue that the procedure used violates the spirit of A.R.S. § 19–205.02.

While the logic of the attorney general's opinion and appellants' argument would apply to the situation in which a person seeks out a voter registrar and is then confronted with a petition, it seems unlikely that a person who has expressed no interest in registering to vote would suddenly feel compelled to sign a petition in order to avail himself of the services of the registrar who has appeared unsolicited at his doorstep.

We find that the procedure used by the recall supporters complied with the letter of the law and was not shown to be coercive in any way.

*ISSUE 4.*

■ Does the fact that neither the county recorder nor the county school superintendent compared the signatures on the registration cards with the signatures on the petitions, require them to be stricken?

As appellee-intervenors point out, the county school superintendent has no statutory duty to authenticate the signatures. This is the job of the county recorder. A.R.S. § 19–208.02 requires the county recorder to "determine from the records of registration the number of qualified electors who have signed the signature sheets." Nothing in the statute explicitly requires the county recorder to compare signatures.

Appellants argue that the county recorder was following a procedure outlined by the attorney general in Op.Atty.Gen. No. 73–15 (R–55). That opinion stated that "the requirements that a petitioner be a registered voter at the time he affixed his name to the petition and that the genuineness of the signature be verified by comparison with the affidavit of registration are *reasonable antecedents* to validating the signatures in this case." (Emphasis ours.) The language of the attorney general's opinion clearly allows a county recorder to insist upon verification by comparison of signatures. The opinion just as clearly does not make this comparison a requirement, but merely approves the guidelines set down by the secretary of state, which do not explicitly require comparison of signatures.

In this case the trial court had the opportunity to compare signatures. The county recorder's procedure, even if somewhat imprecise, was not so haphazard as to justify voiding any signatures. Applying the rule of construing formal requirements liberally in favor of allowing petitions to stand, *Whitman v. Moore,* 59 Ariz. 211, 125 P.2d 445 (1942), we find no error in the trial court's acceptance of the petitions.

*ISSUE 5.*

■ What is the effect of evidence received from Rose Marie Johnson in respect to Issue 4?

Appellant Rose Marie Johnson testified that a number of the signatures in the petitions appeared to be different from those on voter registrations. This evidence by itself is insufficient to invalidate those signatures.

17A A.R.S. Rules of Evidence, rule 901(b)(2) and (3) gives some examples of evidence admissible to authenticate handwriting. The rule includes the following:

"(2) Nonexpert opinion as to the genuineness of handwriting, based upon familiarity *not acquired for purposes of the litigation.* . . .

"(3) Comparison by the trier of fact or by *expert* witnesses with specimens which have been authenticated." (Emphasis added.)

Ms. Johnson was not qualified as an expert, nor was she familiar with the handwriting in question prior to this litigation. The trier of fact, on the other hand, had the petitions and voter registration records in evidence at the time it made its determination. The ruling of the trial court was not shown to be unsupported by any creditable evidence.

*ISSUE 6.*

■ Must a date, address and precinct number be placed on the face of the petitions by the signer when he signs the petition?

Ariz.Const. art. 8 pt. 1 § 2 requires that each signer "must add to his signature the date of his signing said petition, and his place of residence, giving his street and number, if any, should he reside in a town or city." Appellants argue that, because the signers themselves did not fill in the addresses and dates, the petitions did not meet this constitutional requirement.

Appellant argues that *Whitman v. Moore, supra,* establishes a distinction between a

provision which merely requires the information and one which requires that the signer "add to his signature" the information. The *Whitman* opinion does refer to a South Dakota statute which contains the words "add to his signature," implying that such statutory language might require the signer himself to write in the information. However, the *Whitman* opinion goes on to point out that "the purpose for requiring the address of the petitioner is to afford a convenient method of checking whether he is a certified elector, and the date is for the purpose of ascertaining that this was true at the time he signed the petition . . ." 59 Ariz. at 224, 125 P.2d 445. This reasoning applies as much to recall petitions as it does to the initiative petitions discussed in *Whitman.*

Under A.R.S. § 19–205(A) at the time of signing the recall petition, the elector or person circulating the petition shall write in the appropriate spaces the address of the elector and the date of signing. This section would be unconstitutional under appellant's construction of the state constitution. We believe that the purpose of the constitutional provision in question is satisfied when the elector signs the petition indicating his assent to the recall, and, at the same time, either he or the circulator adds the address and date of signing.

*ISSUE 7.*

■ What is the effect of someone other than the circulator filling in the backs of petitions?

The reverse sides of several petitions were filled in by people other than the circulators. Appellants contend that this violates A.R.S. § 19–205(B) (Laws 1973, ch. 159, § 14), and that the petitions must therefore be stricken. We disagree.

A.R.S. § 19–205(B) (Laws 1973, ch. 159, § 14), requires the petition circulator to verify the petition by affidavit. While it does say, "The person before whom the signatures were written on the signature sheet shall write legibly or typewrite on the reverse side of the signature sheet, . . . the names of the signers of the sheet," the

key to the provision is the fact that the petition circulator verifies the names listed. To interpret the statute's language literally would once again violate the rules of construing such provisions liberally in favor of validating petitions. Appellants' interpretation in no way furthers the statutory intent, but rather exalts form over substance. We find no defect in the petitions, the backs of which were filled in by someone other than the circulator, so long as the circulator himself verifies the petition properly.

*ISSUE 8.*

What is the effect of allowing someone to sign someone else's name on the face of the petition?

■ Appellants argue that several of the petition circulators allowed wives to sign their husbands' names to petitions. The trial court's findings of fact indicate that this happened twice. In one case the husband was physically disabled and could not sign the petitions himself. He authorized his wife to sign for him and she signed in his presence. We agreed with the trial court's ruling that these signatures were valid. *Whitman v. Moore,* 59 Ariz. 211, 125 P.2d 445 (1942).

■ The other case involved a man who was out of town when the petitions were circulated. His wife signed for him because she knew he favored the petitions and would not return in time to sign them himself. The trial court correctly ruled that these signatures were invalid. *Lally v. Cash,* 18 Ariz. 574, 164 P. 443 (1917).

The invalidation of this one man's signature would have no effect on the outcome. However, appellants argue that when a petition circulator allows this fraud to be perpetrated the court should consider any signature obtained by such a circulator as inherently untrustworthy. Appellants cite language from *Whitman v. Moore, supra,* supporting this proposition.

The trial court's findings of fact state that, "All persons connected with the recall movement complied with the law as they

understood it. The court finds that there was no intentional deception on the part of any person or group of persons. All recall signatures not expressly found to be invalid in these findings of fact, if not stricken before filing or by the county recorder, and if not withdrawn by the filing of affidavits, are found to be valid and should be counted . . . ." The trial court had substantial evidence upon which to base this finding, and we will not overturn it on appeal.

## ISSUE 9.

What is the effect of Sterling McCann's affidavit as it relates to Mr. Laster's testimony?

James Laster testified that he signed several petitions left on the kitchen table by his wife. He did not know what the petitions were. Sterling McCann, the circulator, then filed these petitions with the standard affidavit stating that all parties had signed in his presence. The trial court found no intentional fraud or deception on McCann's part. Laster's signature was withdrawn. Our treatment of Issue 10 makes further consideration of this issue unnecessary.

## ISSUE 10.

■ What is the effect of a petition not notarized in the presence of the circulator?

Sterling McCann's petitions were notarized by Harold Hubele. McCann testified that they had never met one another. Hubele's deposition indicates that he notarized all petitions in the circulators' presence, but McCann testified that he turned his petitions in to Alice Smith who later had them notarized by Hubele. This procedure obviously conflicts with the attestation of the notary that the petition was signed and sworn to before him. While such a haphazard procedure for notarizing a sworn affidavit cannot be condoned, the record indicates that the two petitions in question contained only 20 signatures each, and that several of the signatures have already been

invalidated for other reasons. Since the number of valid signatures obtained for the recall of both Dennis and Baker far exceeded the required number, the elimination of the improperly notarized petitions would not affect the trial court's ultimate ruling. Since the trial court found no fraudulent intent on the part of either McCann or Hubele, the invalidity of these petitions does not taint the entire recall process.

## ISSUE 11.

■ What is the effect of the striking of names from the petitions by someone other than the county recorder?

A number of signatures were lined out from petitions before they were submitted to the county recorder. Appellants claim that this is not in keeping with the statutory procedure for withdrawing signatures.

Appellants suffered no prejudice because of the signatures which were lined out. This issue is therefore immaterial to the resolution of the case before us.

## ISSUE 12.

■ What is the effect of Harold Hubele's incomplete records?

Appellants argue that Hubele's record of petitions he notarized was inconsistent with his testimony, in that several petitions were not listed in the record. Appellants cite no authority requiring Hubele to maintain a record of his notarizations.* In light of the fact that Hubele began to compile his record after having notarized a number of petitions, there is no inconsistency in his testimony that he did in fact notarize certain petitions which were not listed in his record. Again the trial court's findings of fact support the appellees. Its findings are based on competent evidence and will not be overturned on appeal.

## ISSUE 13.

Are the trial court's findings of fact and conclusions of law supported from the evidence and law?

---

* In fact, A.R.S. § 41–312(4) only requires notaries to keep such records when requested. It is the notary's signature and seal, however, and not his records, which constitute prima facie evidence of the notary's official act. A.R.S. § 41–313(B).

From our review of the record we find that the trial court's findings were supported by substantial evidence and legally correct.

## ISSUE 14.

Do all the facts proved raise such a presumption of illegality as to void this recall process?

While there were a number of irregularities in the procedure of handling the recall petition, we find no reason to set aside the findings of the trial court that there was no fraud or intentional deception.

The judgment of the trial court is affirmed.

STRUCKMEYER, V. C. J., and HAYS and GORDON, JJ., concur.

Note: Chief Justice JAMES DUKE CAMERON did not participate in the determination of this matter.