[No. 44460. En Banc. January 7, 1977.]

CAROLINE A. SUDDUTH, *Appellant,* v. BRUCE K. CHAPMAN, *as Secretary of State, Respondent.*

*Hamley & Hamley* and *G. Cliff Armstrong, Jr.* (*John Remington Graham,* of counsel), for appellant.

*Slade Gorton, Attorney General,* and *Wayne L. Williams* and *Carol A. Smith, Assistants,* for respondent.

ROSELLINI, J.—The appellant brought an action in the Superior Court for Thurston County, pursuant to RCW

29.79.210, seeking a writ of mandate to compel the respondent Secretary of State to certify to the ballot Initiative 322, popularly known as the "anti–fluoridation" measure. The respondent had, after canvasing the petitions, determined that they lacked sufficient signatures to qualify under Const. art. 2, § 1A (amendment 30).[1]

Evidence introduced by the appellant at the Superior Court hearing showed that the respondent had rejected the signatures of 4,656 registered voters because they had signed petitions more than once. The rejection was based upon RCW 29.79.200 which provides, *inter alia:* "If the secretary of state finds the same name signed to more than one petition he shall reject the name as often as it appears."

The appellant also showed that, in the brief period of time during which she had access to the petitions before the court hearing, it was discovered that a number of rejected signatures were in fact signatures of registered voters. Testimony of her expert tended to show that a projection of the ratio of valid signatures to the total number investigated would lead to a conclusion that more than a sufficient number of registered voters had signed the petitions. While the objectivity of the sample used and the qualifications of the witness were questioned by the respondent, he offered no expert testimony contradicting the projections.

The reason that some registered voters were rejected, it appears, was that the respondent did not have in his office any record, or in some cases the current record, of their registration, and did not look beyond the cards on file in his office to determine whether persons signing the petitions were registered voters. The appellant had discovered the canvasing errors by checking 21 rejected signatures against

[1]Const. art. 2, § 1A (amendment 30), provides, in part:

"Hereafter, the number of valid signatures of legal voters required upon a petition for an initiative measure shall be equal to eight percentum of the number of voters registered and voting for the office of governor at the last preceding regular gubernatorial election."

King County voter registration records. She found that 16 of these were registered voters.

The appellant challenged the constitutionality of the provision of RCW 29.79.200 quoted above, contending that all registered voters who signed the petitions were entitled to have their signatures counted once. She further contended that the Secretary of State had the duty to check the rejected signatures against local records, or accord them a presumption of validity, where such rejections were based upon the fact that the names did not appear on records in the respondent's office. The Superior Court rejected both of these contentions, holding RCW 29.79.200 constitutional and concluding that, under applicable statutes, in performing his function of canvasing initiative petitions, the Secretary of State is not obliged to look beyond the registration cards on file in his office, or to take any action to assure that his records are current.

When the appeal to this court was argued, we determined that the Superior Court should be reversed. Because the fruits of the appeal would be lost if our order had to await the preparation of an opinion, there remaining barely sufficient time before election day to comply with the procedures provided in the election law for placing the issue on the ballot, we issued the writ and noted that an opinion would follow. While the initiative subsequently failed at the polls, that fact does not relieve the court of the obligation to explain its order (Const. art. 4, § 2), and this opinion may be regarded as relating back to the date of the writ.

We consider first the constitutionality of RCW 29.79.200, insofar as it provides that, if the Secretary of State finds the same name signed to more than one petition, he shall reject the name as often as it appears. It is contended that this provision exceeds the authority conferred upon the legislature under Const. art. 2, § 1A (amendment 30), to enact legislation "especially to facilitate" the operation of the section providing for the initiative and referendum. This authorization directly follows and modifies the declaration that the section is self-executing.

■ Those provisions of the constitution which reserve the right of initiative and referendum are to be liberally construed to the end that this right may be facilitated, and not hampered by either technical statutory provisions or technical construction thereof, further than is necessary to fairly guard against fraud and mistake in the exercise by the people of this constitutional right. *Rousso v. Meyers,* 64 Wn.2d 53, 390 P.2d 557 (1964); *State ex rel. Howell v. Superior Court,* 97 Wash. 569, 166 P. 1126 (1917); *State ex rel. Case v. Superior Court,* 81 Wash. 623, 143 P. 461 (1914).

■ Was the legislature justified in denying to registered voters who signed petitions more than once, the right to have one of these signatures counted? Does the measure facilitate the initiative process? The respondent makes no showing that it does. The intent of amendment 30, as we read it, was to require that an initiative measure be placed upon the ballot if the requisite number of registered voters sign it. Refusing to count a duplicate signer as one petitioner frustrates, rather than furthers this purpose.

This court impliedly recognized this principle in *Edwards v. Hutchinson,* 178 Wash. 580, 35 P.2d 90 (1934), where it said that when a legal voter has signed a referendum petition, his signature must be counted, even though the person soliciting his signature has violated the law.

Is the measure nevertheless necessary to "fairly guard against fraud and mistake"? *(Rousso v. Meyers, supra* at 60; *State ex rel. Howell v. Superior Court, supra.)* The respondent does not argue that it is. While there are 20 states having constitutions which provide for the initiative and referendum *(see* 21 *Book of the States 1976–1977,* Table 7, at 218 (1976)), he does not suggest that any of them has found it necessary to enact a provision such as that found in RCW 29.79.200, in order to protect the integrity of the initiative process. Our own research has failed to disclose a comparable provision. There appears to be a dearth of cases upon the point, but the Arizona Supreme Court has held without hesitation that where a signature

appears more than once on a petition, it should be counted once. *Whitman v. Moore,* 59 Ariz. 211, 125 P.2d 445 (1942)(overruled with respect to another point only in *Renck v. Superior Court,* 66 Ariz. 320, 187 P.2d 656 (1947)). There the court said, at page 228:

In view of the multiplicity of petitions which are circulated before each election, it is not surprising that some honest citizens may become so confused by the number of petitions presented to them that they may inadvertently sign two or more for the same measure. This, of course, is carelessness on their part, but if they are legally entitled to sign, we think one signature should be allowed and the others stricken.

There is nothing to indicate that the purpose of this provision was to discourage duplication of signatures. It is significant that RCW 29.79.090, which directs that signers be warned of criminal sanctions, does not require that they be warned that duplicate signatures will not be counted.

Were there some showing of facts upon which the legislature could reasonably have found that this provision was necessary to facilitate the initiative process and guard its integrity, we would, of course, be obliged to defer to the legislative judgment; but since no state of facts which would justify it has been proposed, in order to protect the right of the people which was reserved by them in their constitution, we must hold this portion of RCW 29.79.200 to be in excess of the legislative authority granted.

The respondent's theory is that the people, in adopting amendment 30 in 1956, intended to incorporate the provision of RCW 29.79.200 relating to the counting of duplicate signatures, which had first been enacted in 1913, and has never been challenged. This intent can be found, he says, in the fact that the amendment requires a specified number of "valid signatures of legal voters", whereas article 2, section 1A, did not speak in terms of signatures but rather provided that initiative measures should be proposed by a certain percentage of "legal voters". Obviously, this change in language was one of form rather than substance. There was

implicit in article 2, section 1A, a requirement that the signatures be valid, that is, genuine.

■ A reading of the amendment will disclose that its purpose was to change the percentage of voters required to propose a measure. It did not purport to deal with the criteria or methods of determining who is a "registered voter" or what is a "valid signature." In the absence of language in an amendatory enactment indicating that the enactor's attention was directed to a given subject, it will not be presumed that the amendment was intended to affect that subject. *See State v. Sam*, 85 Wn.2d 713, 538 P.2d 1209 (1975).

If the names of the signers whose signatures appeared more than once upon the petitions are added to the total certified by the respondent, the petitions are still short of the required number by 264. The appellant's evidence tended to show that, because the records in the office of the respondent were not kept current, a large number of registered voters were erroneously rejected—and most probably a sufficient number to validate the petition. However, it was the opinion of the Superior Court that the Secretary of State has no statutory obligation to take affirmative steps to see that these records are current. We find the statutes open to a different interpretation.

RCW 29.79.220 places upon the Secretary of State the duty of canvasing the names on a petition within a specified time. It does not provide a method of determining whether the signatures are those of registered voters. RCW 29.07-.090 provides that, at the time of registering any voter, each registration officer shall require him to sign his name upon a card and give his address and precinct. Those cards are to be sent to the Secretary of State's office weekly. RCW 29.07.120.

RCW 29.07.130 provides:

The cards required by RCW 29.07.090 shall be kept on file in the office of the secretary of state in such manner as will be most convenient for, and for the sole purpose of, checking initiative and referendum petitions and

mailing pamphlets required for constitutional amendments and by the initiative and referendum procedure. They shall not be open to public inspection or be used for any other purpose.

It was evidently the opinion of the trial court and is argued here that the Secretary of State under these statutes is obliged to rely upon the diligence of the local registration officers in forwarding registration cards to his office, and is neither authorized nor required to take any action to see that his records are current. We cannot agree with this narrow reading of the statute which places upon him the duty of canvasing the initiative and referendum petitions. RCW 29.07.130 provides that the registration cards shall be used for the sole purpose provided therein. It does not mean that the Secretary of State has no duty to see that his records are kept current. Statutes regulating the elective process should be liberally construed in the voter's favor. *Knowles v. Holly,* 82 Wn.2d 694, 513 P.2d 18 (1973); *State ex rel. Orr v. Fawcett,* 17 Wash. 188, 49 P. 346 (1897).

It must be remembered that the legislature, in placing this responsibility upon the Secretary of State, gave him the primary duty of carrying out the constitutional mandate with respect to the people's right to exercise the legislative power. We cannot conceive that that duty requires no affirmative effort on his part to see that his records are reasonably current, so that persons entitled under the constitution to join in such petitions may have their names counted.

There may be and undoubtedly are limits to the methods which the Secretary of State can employ in making sure that his records are in good order. We do not suggest that, under ordinary circumstances, he is required to examine local registration records. But if he is not receiving the weekly reports required under RCW 29.07.120, he can make a reasonable effort to convince the delinquent registration officers that they should comply with the requirements of the statute. Also, he must be diligent in maintaining the records in his office so that signatures can be effectively and

accurately checked. While the Secretary of State necessarily has discretion in selecting the methods of keeping his records current and orderly, some action must be taken when the records are known to be incomplete.[2]

■ The respondent states that this court has, for over 80 years, held that where there has been substantial compliance with the requirements of the laws governing elections, the actions will be upheld, citing *Seymour v. Tacoma,* 6 Wash. 427, 33 P. 1059 (1893); *Loop v. McCracken,* 151 Wash. 19, 274 P. 793 (1929); and *Vickers v. Schultz,* 195 Wash. 651, 81 P.2d 808 (1938). All of these cases have held that technicalities will be overlooked in order to give effect to the will of the people expressed in an election. They do not support the proposition that irregularities will be overlooked where they result in the denial of the franchise or the right of petition.

It must be remembered that the constitutional provision is self-executing. In a case such as this, where the proponent of a measure was able to discover a substantial number of errors due to inadequacy of records within a very short period of time, and where the evidence shows that the Secretary of State was aware of the state of his records and does not claim to have taken any steps to see that the situation was corrected, and where out of 13,043 rejected signatures only 264 are needed to qualify the measure, we think that the presumption of validity which attaches to a signature upon a petition[3] must weigh sufficiently in the proponent's favor to entitle her to have the measure placed upon the ballot.

---

[2]In fairness to the respondent, it should be noted that his interpretation of his duties does not differ materially from that of his predecessors.

[3]There is a presumption that petitions that have been circulated, signed, and filed are valid, and the burden of proof to show their invalidity rests upon those protesting against them. *Whitman v. Moore,* 59 Ariz. 211, 125 P.2d 445 (1942); *State ex rel. Hill v. Olcott,* 67 Ore. 214, 135 P. 902 (1913); 42 Am. Jur. 2d *Initiative and Referendum* § 54 (1969).

It has previously been so ordered.

HUNTER, WRIGHT, BRACHTENBACH, and DOLLIVER, JJ., concur.

[En Banc.     February 17, 1977.]

HOROWITZ, J. (dissenting)—The Secretary of State refused to certify Initiative 322 for the ballot, because the initiative lacked sufficient signatures (117,804) to comply with amendment 30 to the State Constitution as implemented by RCW 29.79 as amended, particularly RCW 29.79.200; RCW 29.07.090 and RCW 29.07.130.

The trial court, after taking evidence upholding the action of the Secretary of State, entered findings, conclusions, and judgment. Petitioner appealed the trial court's judgment to this court and this court by a vote of 5 to 4 reversed.

The majority opinion relies on three grounds for reversal, (1) RCW 29.79.200, which provides that multiple signatures by one person on initiative and referendum petitions are not to be counted, is void, (2) RCW 29.07.130 and RCW 29.07.090 do not confine the Secretary of State to checking the validity of signatures on petitions to signatures on voter registration cards in his office, and (3) if grounds one and two are valid, there is sufficient evidence to prove Initiative 322 contains the remaining ballot signatures needed to qualify the initiative for the ballot.

If any of the three arguments is not accepted, then there are insufficient signatures on the initiative for the ballot and the trial court's judgment must be affirmed.

It is our duty to give full effect to the will of the people as set forth in amendments 7 and 30 to the State Constitution. The people have imposed and also authorized the legislature to impose certain safeguards to protect the

integrity and the workability of the operation of the initiative and referendum. We give effect to the will of the people both when we uphold the validity of the canvasing process upon a proper showing and when we uphold the action of the Secretary of State in refusing to certify an initiative for the ballot when the law and facts require such an action. We now consider the three arguments on which the majority relies to reverse the trial court's judgment.

### MULTIPLE SIGNATURES—RCW 29.79.200

There was still a shortage in the required number of signatures for Initiative 322 even if multiple signatures by each person signing more than once on the initiative petitions are counted as one signature.

The seventh amendment to the State Constitution was approved November 1912. Article 2, section 1(d) of the amendment made express provision for implementing legislation as follows:

> All such petitions shall be filed with the secretary of state, who shall be guided by the general laws in submitting the same to the people until additional legislation shall especially provide therefor. This section is self–executing, but legislation may be enacted especially to facilitate its operation.

The legislature in 1913 then enacted implementing legislation. Laws of 1913, ch. 138, p. 418. The legislation included provisions prohibiting and discouraging multiple signatures on initiative and referendum petitions presumably to "facilitate" the operation of the initiative referendum process. Laws of 1913, ch. 138, § 15, p. 426; § 16, p. 427; and § 31, p. 435. Section 15 reads in part:

> If he [secretary of state] find the same name signed to more than one petition he shall reject both names from the count.

This language was retained when the statute was amended by Laws of 1933, ch. 144, § 1, p. 490. The substance of the language was again retained in Laws of 1965, ch. 9, § 29.79.200, p. 901 and Laws of 1969, 1st Ex. Sess., ch.

107, § 1, p. 815. The 1969 act contains the language now in RCW 29.79.200:

> If the secretary of state finds the same name signed to more than one petition he shall reject the name as often as it appears.

The foregoing language has not been changed.

The legality of the 1913 provision dealing with multiple signatures has been assumed as a proper exercise of legislative power delegated to the legislature by the seventh amendment. This court so assumed in *State ex rel. Case v. Superior Court,* 81 Wash. 623, 143 P. 461 (1914). In describing the secretaries of state's duty and power to reject signatures for fraud under the 1913 statute as it then read, the court pointed out the only power the secretary of state had was to refuse to count multiple signatures as provided by the 1913 statute. Had the court believed the secretary of state had no such power, this reason would not have been available. Until the filing of the majority opinion in the instant case, successive secretaries of state, in obedience to the mandate of the 1913 act first reaffirmed by the 1933 amendment, have refused to count multiple signatures at all.

The majority argues the multiple signature statute is void because it does not "facilitate" the operation of the initiative process as required by Const. art. 2, § 1(a) (amendment 7). I do not agree.

When the legislature granted authority in amendment 7 to enact legislation to facilitate the operation of the initiative and referendum process, it necessarily vested in the legislature a discretion in its choice of means so to do. This is made clear by the rationale used in *State ex rel. Kiehl v. Howell,* 77 Wash. 651, 138 P. 286 (1914); *State ex rel. Chamberlain v. Howell,* 80 Wash. 692, 142 P. 1 (1914); and *State v. Conifer Enterprises, Inc.,* 82 Wn.2d 94, 508 P.2d 149 (1973). In *Kiehl* a statute required initiative petitions to be filed not less than 10 months before the election on the initiative. The statute was held valid notwithstanding the seventh amendment provided the initiative would be on

the ballot "if filed at least 4 months before the election."
The court said:

> The legislature is expressly authorized to enact laws to
> facilitate the initiative and referendum. It seems clear to
> us that a limitation upon the time within which, prior to
> the election, a proposed measure may be filed and the
> procuring of signatures of voters to the petitions com-
> menced, is a proper subject of legislation, looking to
> orderly procedure and fairness to the electors. While the
> constitutional amendment is declared to be self–execut-
> ing, it is apparent that its execution would be almost, if
> not wholly, impracticable without legislation of some
> such nature as this. It, of course, is necessary that some
> practical test be provided for determining whether the
> signers of the petitions are legal voters. It is, of course,
> but fair that the petitions should, so far as practical, be
> signed only by those who would be voters at the election.
> This can be secured with greater certainty by having the
> petitions signed as near the time of the election as
> practical. . . . We are of the opinion that it is within the
> power of the legislature to fix a reasonable limit of time
> preceding the election within which an initiative measure
> may be filed with the secretary of state.

*State ex rel. Kiehl v. Howell, supra* at 654. In *State ex rel.
Chamberlain v. Howell, supra* at 696–97, the court upheld
the statute requiring those who filed arguments in support
of an initiative for inclusion in the state pamphlet required
to be published by statute to pay for the resulting increased
cost of paper, printing, and binding of the state pamphlet.
The court said:

> But there is nothing in the constitution prohibiting the
> legislature from requiring a fee for filing, printing, or
> binding either the proposed measure, or the arguments.
> It is clear that, where the constitution does not prohibit
> the legislature from requiring a fee in such case, it is
> within the power of the legislature to require a fee . . .
> The constitution does not, in terms or inferentially,
> require the state to bear the expense of the publication of
> these arguments. It simply requires the legislature to
> provide methods of publicity, without limitation as to

fees. The legislature, therefore, may require the proponents of any measure to pay the expense of the arguments or of the distribution or of the publicity. It has not, however, seen fit to do so. . . . This is not an unreasonable requirement, and no provision of the constitution is cited to us which proclaims such provisions invalid.

In *State v. Conifer Enterprises, Inc., supra* at 97, the court upheld RCW 29.79.490(4), making it a crime to pay people to obtain signatures for an initiative petition. The court stated:

It is indisputable that there is a substantial state interest in the integrity of the whole scope of the elective processes, including those procedures involved in the direct legislative efforts of the people via the initiative.

In 1956 the people adopted amendment 30 to the State Constitution to change the minimum number of signatures required to qualify an initiative for submission to vote of the people. Const. art. 2, § 1A (amendment 30) provided:

Hereafter, the number of valid signatures of legal voters required upon a petition for an initiative measure shall be equal to eight percentum of the number of voters registered and voting for the office of governor at the last preceding regular gubernatorial election.

Clearly the people made it plain that in order to qualify for the ballot an initiative had to have the minimum number of signatures called for by that amendment. Amendment 30 made no change in the prohibition against counting multiple signatures originally contained in Laws of 1913, ch. 138, and continued in substance thereafter. The prohibition against counting any multiple signatures has continued to be honored by successive secretaries of state until the majority of this court in the instant case held the statutory prohibition to be void. Prior thereto, not only was the prohibition continuously enforced but the petitions including those used to obtain signatures for Initiative 322 warned against multiple signatures. Thus under the heading of "Instructions to Signers and Volunteer Solicitors," each initiative petition of Initiative 322 states:

Voters may sign Initiative No. 322 only once. If a voter signs more than once, that signature is lost completely and the voter is also subject to fine and imprisonment.

In addition, each petition contained a warning pursuant to RCW 29.79.100 that "every person . . . who knowingly signs more than one of these petitions . . . shall be punished by fine or imprisonment or both."

The legislature, in enacting the prohibition to count multiple signatures was exercising its discretion as to the best method of implementation it considered appropriate to protect the operation of the initiative and referendum process against error and even fraud. The legislature wished to provide some substantial measure of assurance that the signatures on the petition would be validly affixed by legal voters and that such signatures could be expeditiously counted with a minimum chance of error and expense.

It is true the legislature might have determined in the exercise of its discretion that it would be an adequate sanction if the multiple signatures were counted once for every person signing in that fashion or that an adequate sanction would be provided if the sanction were limited to criminal prosecution. However, the legislature had a right to believe the criminal sanction would be inadequate to prevent multiple signatures because of the requirement of proving beyond a reasonable doubt that the signatory knowingly signed his name more than once. Laws of 1913, ch. 138, § 31, p. 435. Moreover, the possibility of prosecutions might well involve thousands of instances and these prosecutions would necessarily be slow, costly, and clog the courts with cases. The legislature therefore had a right to determine in the exercise of its judgment that a more effective remedy was not to count multiple signatures at all. As a matter of fairness in administering the initiative, the petitions carried appropriate warning to signatories that multiple signatures would not be counted at all and could result in a criminal penalty.

We cannot fairly say the prohibition against the counting of multiple signatures does not "facilitate" the operation of

the initiative and referendum process. The legislature had a right to provide a remedy for the evils resulting from multiple signatures. Nor can we say that no reasonably conceivable state of facts exists to justify the legislation. Moreover we are not a super legislature. We cannot substitute our notions of wisdom for that of the legislature. We cannot say as a matter of law, as does the majority, in effect, that the prohibition against counting of multiple signatures at all does not "facilitate" the operation of the initiative and referendum process. *See Brewer v. Copeland,* 86 Wn.2d 58, 542 P.2d 445 (1975); *State v. Conifer Enterprises, Inc., supra.*

The fact that the 1913 act as amended has so long been observed (1913–1976) makes applicable the rule of statutory construction well stated in *State ex rel. Pirak v. Schoettler,* 45 Wn.2d 367, 371–72, 274 P.2d 852 (1954):

> When a statute is ambiguous, the construction placed upon it by the officer or department charged with its administration, while not binding on the courts, is entitled to considerable weight in determining the intention of the legislature. *Smith v. Northern Pac. R. Co.,* 7 Wn. (2d) 652, 110 P. (2d) 851.
>
> The persuasive force of such an interpretation is strengthened when the legislature, by its failure to amend a statute, "silently acquiesces" in the administrative interpretation.

*See also Morin v. Johnson,* 49 Wn.2d 275, 279, 300 P.2d 569 (1956).

Furthermore the fact neither the people nor the legislature made change in the statutory prohibition against counting of multiple signatures is strong evidence that the people and the legislature saw no legal objection to the prohibition so long observed and assumed to be valid by this court as early as 1914 in *State ex rel. Case v. Superior Court, supra.*

The majority relies upon *Whitman v. Moore,* 59 Ariz. 211, 228, 125 P.2d 445 (1942) to support its argument that multiple signatures must be counted at least once per person. The majority, however, fails to note the sentence

immediately preceding the language it quotes from. The Arizona court there stated:

It is true that a man declares he has not signed and will not sign any other petition for the same measure, but *nothing in the law states that he shall be disqualified so far* as one signature is concerned because he may have inadvertently affixed his signature to another petition for the same measure.

(Italics mine.) In Washington, however, *unlike* Arizona, RCW 29.79.200—a valid statute—does disqualify the multiple initiative signatures entirely. *Whitman v. Moore, supra,* does not support the majority. The case, rather, supports the action of the Secretary of State in following the statutory prohibition against counting multiple signatures at all.

### THE USE OF REGISTRATION CARDS

The majority also argues the Secretary of State must go outside the registration cards in his office to check the validity of signatures on the initiative petitions. This argument is then followed by a discussion of the evidence to show that had the Secretary gone outside of the registration cards in his office, sufficient additional signatures would have been found to qualify the initiative for the ballot.

There is no claim that RCW 29.79 or any other statute expressly requires the Secretary of State to do this. The majority claims rather that notwithstanding RCW 29.07.090 and RCW 29.07.130, which direct the Secretary of State to check petition signatures by reference to the signatures on registration cards in his office, the Secretary of State is required to go outside those cards because it would improve the accuracy of his count. The majority seeks to justify this approach by claiming the statutes are ambiguous (without particular specification) and this claimed ambiguity should be resolved by requiring the Secretary of State to conduct his checking by recourse to registration cards in the 39 counties of the state.

There are at least two difficulties with this argument. First, it fails to heed what was said by this court in *State*

*ex rel. Evich v. Superior Court,* 188 Wash. 19, 30–31, 61 P.2d 143 (1936), which had the effect of eliminating any ambiguity. In that case the court described the secretary of state's role in determining whether sufficient valid signatures are present. The court stated:

> He is to ascertain the number of names of legal voters on the petition, and the standard manifestly is by comparison with the registration cards *in his office* certified to him by the local registration officers, in accordance with the provisions of § 13 of the permanent registration act, providing that these registration cards are deposited with him for the sole purpose of
> ". . . checking initiative and referendum petitions, and mailing pamphlets containing constitutional amendments, initiative and referendum measures," etc.
> That the secretary of state must compare the signatures on the petition, is further evidenced by Rem. Rev. Stat. (Sup.), § 5412 [P.C. § 2765], quoted above, requiring him to keep a record of all names appearing on the petition of persons not registered voters and report them to the prosecuting attorneys.

(Italics mine.)

It is noted that this court did not say the secretary of state was required to check the signatures on the registration cards in the possession of county auditors of each of the 39 counties of the state.

Secondly, if the last cited statutes are ambiguous as claimed, the construction placed thereon by the uniform practice of the office of Secretary of State since 1913 (RCW 29.07.130), without legislative change, provides strong evidence the secretary of state has no duty to go outside the registration cards in his office for purposes of checking signatures. *See Retail Store Employees Local 1001 v. Washington Surveying & Rating Bureau,* 87 Wn.2d 887, 558 P.2d 215 (1976); *State ex rel. Pirak v. Schoettler, supra.*

If a change is to be made in the duties of the secretary of state, it is for the legislature to do so. Again, it is to be noted this court is not a super legislature. A proper respect for the limitations on this court's powers, in light of the

separation of powers doctrine, precludes our substituting our views as to desirable improvements in the applicable legislation for those of the legislature. *King County v. Seattle,* 70 Wn.2d 988, 425 P.2d 887 (1967); *Department of Labor & Indus. v. Cook,* 44 Wn.2d 671, 269 P.2d 962 (1954).

EVIDENCE OF ERRONEOUS COUNT

The final argument of the majority is that *if* the Secretary of State was under a duty to count multiple signatures by the same person once instead of not at all and, *if* the Secretary of State was also under a duty to check signatures against voter registration cards in each of the counties of the state, instead of confining himself to voter registration cards in his office sent there pursuant to RCW 29.07-.090, then the record shows there were at least 264 signatures not counted—the number still needed to make up the minimum number of signatures required. Majority opinion page 253. The trial court did not so find. Instead, that court necessarily found otherwise by upholding the action of the Secretary of State. See finding of fact No. 1(3); conclusion of law No. 4.

The majority argues in somewhat general terms the evidence shows "a large number of registered voters" signatures were erroneously rejected. No analysis of the testimony actually given on which petitioner based her claim of erroneous count at trial is set forth. Possibly, however, the majority may have relied on the somewhat lengthy testimony of petitioner's principal supporter of the initiative who testified he was an expert and as such could testify as to the probability of error and the extent thereof. The testimony was necessary to show that there were at least 264 valid signatures not counted. The witness based his testimony concerning the extent of probable error on an alleged random sample of 21 signatures of registered voters from King County, 16 of which were claimed to have been erroneously rejected for want of voter registration cards in the Secretary of State's office. The expert explained his

opinion was based on the random nature of the sample. He testified:

> The only thing I can say is based on a random sample. I cannot vouch for whether the sample was chosen randomly or not; but I can give a projection based on the supposition that 16 signatures out of 21 were found to be incorrectly rejected and were chosen randomly. That would be the only basis of my opinion.

The assistant attorney general objected the sample was not a random sample. He stated:

> [T]here is simply no evidence in the record that these names that were selected were selected at random. In fact, the testimony is directly contrary to the individuals in question. At least one of them said he picked people he knew or got signatures from and they were all selected from King County.

The witness was permitted to testify subject to the acceptance of the court of his testimony. At one point the court said concerning the believability of the testimony:

> the Court has a right to accept or reject any evidence, no matter what the qualifications of the specialist might be.

His testimony included a cross–examination to test the credibility of the opinions of the witness based upon other hypotheticals and assumptions, including the assumption the sample was not a random sample. Petitioner's attorney at one point stated: "I'm ready to stipulate we don't have a perfectly random sample . . ."

The trial court had a right to weigh the witness' testimony as it had indicated it would, and to accept it if convincing or to reject it if not. It apparently rejected it as speculative and unconvincing. See finding of fact No. 1(3); conclusion of law No. 4. This rejection was within its power under the familiar rule that the credibility of witnesses is for the trial court. *Carson v. Mills,* 49 Wn.2d 597, 304 P.2d 712 (1956); *N. Fiorito Co. v. State,* 69 Wn.2d 616, 618–19, 419 P.2d 586 (1966). I cannot find the trial court abused its discretion in rejecting the testimony. This court lacks

power to disregard the court's findings if supported by substantial evidence and then make findings of its own contrary to the trial court's findings. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

The trial court's judgment upholding the refusal of the Secretary of State to certify Initiative 322 for the ballot should have been affirmed.

HAMILTON, STAFFORD, and UTTER, JJ., concur with HOROWITZ, J.